## DEPARTMENT OF YOUTH SERVICES *vs.* A JUVENILE.

Plymouth. May 6, 1986. — November 4, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Due Process of Law,* Vagueness of statute, Mental health. *Constitutional Law,* Cruel and unusual punishment. *Mental Health. Practice, Civil,* Proceeding to extend commitment of a juvenile, Commitment of mentally ill person. *Evidence,* Communication between patient and psychotherapist, Expert opinion, Hearsay, Judicial discretion. *Practice, Criminal,* Attendance of witnesses, Request for fees and costs.

Provisions of G. L. c. 120, §§ 16-20, extending the term of a juvenile's commitment to the Department of Youth Services beyond his eighteenth birthday "if after a full hearing the court is of opinion that discharge of the . . . [juvenile] would be physically dangerous to the public because of his mental or physical deficiency, disorder, or abnormality" were not unconstitutionally vague as applied to a juvenile committed to the department at age seventeen after being adjudicated delinquent on a complaint alleging a sexual offense, nor did the statute violate constitutional prohibitions against cruel and unusual punishments. [521-524]

In a District Court proceeding under G. L. c. 120, §§ 16-20, to extend the term of a juvenile's commitment to the Department of Youth Services beyond the juvenile's eighteenth birthday, a serious risk of a miscarriage of justice was created by the admission in evidence of a psychiatrist's diagnosis based in part upon his interview with the juvenile, where the juvenile had not been warned, in accordance with the rule articulated by this court in *Commonwealth* v. *Lamb,* 365 Mass. 265 (1974), that the conversation was not confidential and could be used against him in the proceeding. [524-526]

On a juvenile's appeal from the judgment of a District Court under G. L. c. 120, §§ 16-20, extending his commitment to the Department of Youth Services beyond his eighteenth birthday, there was no merit to the department's argument that the warnings prescribed in *Commonwealth* v. *Lamb,* 365 Mass. 265 (1974), were inapplicable in an instance where the department sought a psychiatric evaluation on its own initiative, without seeking a court order for such an evaluation. [526]

Discussion of rule 703 of the Proposed Massachusetts Rules of Evidence, which would permit an expert witness to testify to an opinion based on facts or data not admissible in evidence. [527-531]

An expert witness may testify to an opinion based on facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert opinion, and the witness shall be subject to cross-examination designed to elicit the underpinnings of his opinion. [531-532]

In a District Court proceeding under G. L. c. 120, §§ 16-20, to extend the term of a juvenile's commitment to the Department of Youth Services beyond the juvenile's eighteenth birthday, no error appeared in the judge's allowance of respective motions by the department to quash a summons issued for a certain prospective witness, and by the juvenile to exclude evidence of the incident concerning which the witness was expected to testify. [533]

The record in a District Court proceeding under G. L. c. 120, §§ 16-20, to extend the term of a juvenile's commitment to the Department of Youth Services beyond the juvenile's eighteenth birthday provided no support for the juvenile's contention that insufficient funds had been allowed him to employ an expert psychiatric witness. [533]

APPLICATION for review of an order to extend commitment, filed in the Brockton Division of the District Court Department on October 5, 1984.

On appeal to the jury session of that division, the case was tried before *Robert A. Welsh, Jr.,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Douglas C. Marshall* for the juvenile.

*Bruce A. Cardello,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The juvenile is in a secure facility (Butler Center) run by the Department of Youth Services (department). Although he is over eighteen, he is in the department's custody because a jury of six determined that if discharged from the department he "would be physically dangerous to the public because of his mental disorder or abnormality." See G. L. c. 120, §§ 16-20 (1984 ed.). The juvenile appeals, alleging that the statutory provisions under which he is held are unconstitutional; that the judge erred in permitting a psychiatrist to testify because he (the juvenile) was not warned that his statements to the psychiatrist could be used to extend his commitment to the department; that it was error to admit the doctor's opinion

because his opinion was based on hearsay reports and conversations and not facts and data admitted in evidence; and that the judge erred in two other rulings. We granted direct appellate review on our own motion. For the reasons stated herein, we conclude there must be a new trial. We therefore reverse and remand for a new trial.

We summarize the prior proceedings. At age seventeen, the juvenile was adjudicated delinquent on a complaint alleging indecent assault and battery on a child under fourteen. See G. L. c. 265, § 13B. He was committed to the department, and shortly thereafter the department requested permission from the District Court to extend the juvenile's commitment beyond his eighteenth birthday. See G. L. c. 120, §§ 16 & 17.[1] After a hearing pursuant to G. L. c. 120, § 18,[2] a District Court

---

[1] General Laws c. 120, § 16 (1984 ed.), provides: "Every person committed to the department as a wayward child or delinquent child, if not already discharged, shall be discharged when he reaches his eighteenth birthday, unless a petition is filed by the department under section seventeen. Every person committed to the department after conviction in criminal proceedings, unless already discharged, shall be discharged when such person reaches his twenty-first birthday, unless a petition is filed by the department under section seventeen. The department may continue to have the responsibility for any person provided for in this chapter under twenty-one years for the purposes of specific educational or rehabilitative programs, under conditions agreed upon by both the department and such person and terminable by either."

General Laws c. 120, § 17 (1984 ed.), provides: "Whenever the department is of the opinion that discharge of a person from its control at the age limit stated in section sixteen would be physically dangerous to the public because of the person's mental or physical deficiency, disorder or abnormality, the department shall make an order directing that the person remain subject to its control beyond the period and shall make application to the committing court for a review of that order by the court. The order and application shall be made at least ninety days before the time of discharge stated in section sixteen. The application shall be accompanied by a written statement of the facts upon which the department bases its opinion that discharge from its control at the time stated would be physically dangerous to the public, but no such application shall be dismissed nor shall the order be discharged, merely because of its form or an asserted insufficiency of its allegations; every order shall be reviewed upon its merits."

[2] General Laws c. 120, § 18 (1984 ed.), provides: "If the department applies to the court for review of an order as provided in section seventeen, the court shall notify the person whose liberty is involved, and if he or she

judge concluded that the juvenile "would be physically danger-
ous to the public because of his mental disorder or abnormality
if he were discharged from the control of the [department] at
this time." The judge extended the juvenile's commitment to
the department beyond his eighteenth birthday. Pursuant to
G. L. c. 120, § 20,[3] the juvenile appealed to a six-person jury

---

be not sui juris, his parent or guardian (if such person can be reached and
if not the court shall appoint a person to act in the place of the parent or
guardian), of the application, and shall afford him an opportunity to appear
in court with the aid of counsel and of process to compel attendance of
witnesses and production of evidence. When he is unable to provide his
own counsel, the court shall appoint counsel to represent him.

"If after a full hearing the court is of opinion that discharge of the person
to whom the order applies would be physically dangerous to the public
because of his mental or physical deficiency, disorder, or abnormality the
court shall confirm the order of the department. If the court is of opinion
that discharge of the person from continued control of the department would
not be physically dangerous to the public, the court shall disapprove the
order of the department and shall order the person to be discharged from
its control."

General Laws c. 120, § 19 (1984 ed.), provides: "When an order of the
department is confirmed as provided in section eighteen, the control of the
department over the person shall continue, subject to the provisions of this
chapter; but, unless the person is previously discharged in accordance with
section six (*e*), the department shall, within two years after the date of such
a confirmation in the case of persons committed as wayward children or
delinquent children, or within five years after the date of such a confirmation
in the case of persons committed after conviction in criminal proceedings,
make a new order and a new application for review thereof in accordance
with the provisions of section seventeen. Such orders and applications may
be repeated at intervals as often as in the opinion of the department may
be necessary for the protection of the public, except that the department
shall have power, in order to protect other children and adolescents, to
transfer the custody of any person eighteen years of age or older to the
department of correction for placement in the appropriate institution.

"Every person shall be discharged from the control of the department at
the termination of the period stated in this section unless the department
has previously acted as therein required, and shall be discharged if the court
fails to confirm the order as provided in section eighteen."

[3] General Laws c. 120, § 20 (1984 ed.), provides: "(a) If under the
provisions of sections eighteen and nineteen the court confirms an order,
the person whose liberty is involved may appeal to a district court jury
session for a reversal or modification of the confirmation. The appeal shall
be taken in the manner provided by law for appeal to the said session from
judgments of a justice sitting without jury in criminal cases. (b) After the

which also concluded that the juvenile would be "physically dangerous to the public" if released from the department.

We summarize the facts. Doctor Lawrence Gibson, a psychiatrist, said that he evaluated the juvenile on behalf of the department and the Butler Center (center), a strict security treatment center in which the juvenile was residing as a result of the adjudication of delinquency.[4] Doctor Gibson's evaluation consisted of several meetings with the juvenile, meetings with the juvenile's therapist, meetings with the criminal coordinator at the center, and of a review of the juvenile's records at the center. Based on his evaluation, Dr. Gibson concluded that the juvenile had "disorders of emotion and perception" which manifested themselves by an "inability to cope with the demands of life," inappropriate anger, stealing, lying, self-doubt, and aggression toward others. The doctor stated that in his opinion "there's a great likelihood that those type of behaviors [i.e., 'inappropriate contact of a sexual nature in young children'] will be repeated again [unless the juvenile undergoes] a substantial change in his personality structure." He opined that the juvenile presented a "very significant danger [to] the physical well being of the community."

Doctor Richard Lazur, a psychologist who worked as a clinical coordinator at the center, was of the opinion that the

---

hearing of the appeal the jury session may affirm the order of the justice, or modify it, or reverse it and order the appellant to be discharged by the board. (c) Pending the appeal the appellant shall remain under the control of the board."

[4] The Butler Center, which is funded by the department, is a strict security, long-term residential treatment center for severely disturbed adolescents. At the time of trial, the center had somewhere between fifteen to eighteen patients and about thirty-three or thirty-four staff members. The staff, which is available constantly, includes counseling, nursing, and security personnel. The clinical staff consists of two psychologists and two social workers. The center is operated for young adults who have "a problem that requires treatment not simply incarceration." To that end, the center offers intensive psychological treatment, combining individual psychotherapy (about two or three times per week) with group therapy (five times per week) and family therapy. The center also offers recreational programs and classroom instruction, including classes in mathematics, English, science, social studies and "vocational education."

juvenile suffered from a "severe emotional disturbance" which required in-patient treatment. Doctor Lazur characterized the juvenile as mild-mannered, compliant and "very nice" and noted that he "tends to not cause behavioral disturbances" or express anger. Doctor Lazur stated that the juvenile is impulsive, feels victimized, feels that he "has no responsibility for what goes on with his life," and has "difficulty getting along with people and forming adequate social relationships with them." He further opined that the juvenile's feelings of victimization, his mild-mannered personality and his denial of responsibility for his actions are characteristic of child molesters. Doctor Lazur concluded that the juvenile presented "a very severe threat to the public, especially to the children in the community."

The charge for indecent assault and battery on a child under fourteen was the only charge ever filed against the juvenile. Reports from the juvenile's teachers at the center indicated that his classroom performance and behavior were favorable. A current and a former member of the staff at the Boys' Shelter in Brockton, where the juvenile resided prior to his placement at the center, said that, while the juvenile was at the Boys' Shelter, he had no restrictions imposed upon him for infraction of rules, did not attempt to escape, and did not assault or threaten to assault anyone.

1. *Constitutionality of G. L. c. 120, §§ 16-20.* The juvenile challenges the constitutionality of G. L. c. 120, §§ 16-20, arguing that (1) it is unconstitutionally vague because it does not adequately define or establish guidelines for determining that a defendant is "dangerous to the public" and suffers from a "mental or physical deficiency, disorder or abnormality"; and (2) it unconstitutionally permits cruel and unusual punishment by providing for criminal commitment of a person for an unlimited period because of his mental or physical status. Although the juvenile did not properly challenge the constitutionality of G. L. c. 120, §§ 16-20, prior to trial, he did raise the constitutionality of the statute in his motion for directed verdict in this posture. We first consider the statute on an as-applied basis. See *Commonwealth* v. *Jasmin,* 396 Mass. 653, 655 (1986).

The juvenile challenges the constitutionality of the statute on vagueness grounds. "A law is void for vagueness if persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.' *Smith* v. *Goguen,* 415 U.S. 566, 572 n.8 (1974), quoting *Connally* v. *General Constr. Co.,* 269 U.S. 385, 391 (1926). Vague laws violate due process because individuals do not receive fair notice of the conduct proscribed by a statute, *Papachristou* v. *Jacksonville,* 405 U.S. 156, 162 (1972), and because vague laws that do not limit the exercise of discretion by officials engender the possibility of arbitrary and discriminatory enforcement, *Grayned* v. *Rockford,* 408 U.S. 104, 108-109 & n.4 (1972)." *Commonwealth* v. *Jaffee, ante* 50, 54 (1986), quoting *Caswell* v. *Licensing Comm'n for Brockton,* 387 Mass. 864, 873 (1983). Further, "[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States* v. *Powell,* 423 U.S. 87, 92 (1975), quoting *United States* v. *Mazurie,* 419 U.S. 544, 550 (1975). See *Commonwealth* v. *Adams,* 389 Mass. 265, 271 (1983).

The facts of this case include evidence before the judge, and then the jury of six, that due to the juvenile's mental disorder or disturbance, he is "physically dangerous to the public." This evidence was presented in the form of two expert opinions. The experts opined that the juvenile suffered from a "severe emotional disturbance," and these opinions were admitted without objection from the juvenile.[5] As this court recognized, "a State may validly exercise its police power to confine persons who are adjudicated mentally ill and dangerous." *Thompson* v. *Commonwealth,* 386 Mass. 811, 815 (1982).[6] See *Addington* v. *Texas,* 441 U.S. 418, 429 (1979).

---

[5] While we conclude in parts 2 and 3 that this opinion evidence was given in violation of *Commonwealth* v. *Lamb,* 365 Mass. 265 (1974), and was based on inadmissible hearsay, it is necessary to evaluate that evidence admitted without objection to determine "the facts of the case at hand."

[6] We leave open the question whether the department may validly seek a second commitment extending its custody over the juvenile for an additional two years or whether it can transfer the juvenile to the Department of Correction. See G. L. c. 120, § 19.

Cf. *O'Connor* v. *Donaldson,* 442 U.S. 563, 576 (1975) (a State may not hold nondangerous mentally ill persons against their will). Therefore, in light of the evidence presented at trial, a vagueness challenge to the statute fails.

We next turn to the juvenile's claim that G. L. c. 120, §§ 16-20, is unconstitutional because it subjects a person to cruel and unusual punishment for his mental or physical status as one who is "physically dangerous to the public because of [his] mental or physical deficiency, disorder or abnormality." *Robinson* v. *California,* 370 U.S. 660 (1962).[7] Unlike the statute in *Robinson,* however, which punished addiction to narcotics, this statute confines an individual due to a mental condition that renders him dangerous to the public. A State may validly exercise its police power to confine persons who are adjudicated mentally ill and dangerous. *Thompson* v. *Commonwealth, supra.*

While we have had few opportunities to construe c. 120, we are guided by the more explicit provisions of G. L. c. 123, a statute which regulates commitment of a mentally ill person. General Laws c. 120, §§ 16-20, differs from c. 123 in that it is concerned with the treatment of juveniles. See *Department of Youth Servs.* v. *A Juvenile,* 384 Mass. 784, 791-793 (1983). Both G. L. c. 123 and c. 120, §§ 16-20, however, are statutes which have as their purpose the protection of others from physical harm and the treatment of the mentally ill person. See *Department of Youth Servs., supra* at 791; *Commonwealth* v. *Nassar,* 380 Mass. 908, 918 (1980). Therefore, in construing G. L. c. 120, we refer to c. 123's definitions of similar words and phrases because the two statutes are concerned with the same general subject matter. See *Commonwealth* v. *Baker,* 368 Mass. 58, 69 (1975); *Commonwealth* v. *Flynn,* 285 Mass. 136, 140 (1934).

---

[7] *Robinson* involved a State statute making it a crime to "be addicted to the use of narcotics." The Supreme Court held that "a state law which imprisons a person thus afflicted [with narcotic addiction] as a criminal, even though he has never touched any narcotic drug within the State or has been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment." *Id.* at 667.

Under G. L. c. 123, § 8, an individual may be confined if the fact finder concludes that "such person is mentally ill, and . . . the discharge of such person . . . would create a likelihood of serious harm." These standards are applicable to proceedings under c. 120. General Laws c. 120, § 17, requires a finding that a person is "dangerous to the public" as a result of a "mental or physical deficiency, disorder or abnormality." In construing these statutes, the term "mental illness" promulgated under c. 123[8] shall be used to define c. 120's requirement of "mental or physical deficiency, disorder or abnormality." Similarly, the c. 123 definition of "likelihood of serious harm"[9] is the appropriate definition to be employed in giving meaning to "dangerous to the public" as used in c. 120.[10]

2. *Lamb warnings.* The juvenile claims that it was error to permit Dr. Gibson, the psychiatrist, to testify because the doctor did not warn him prior to interviewing him that their conver-

---

[8] The Department of Mental Health defined mental illness in 104 Code Mass. Regs. § 3.01 (1) (a) (1978): "[F]or purposes of involuntary commitment to the determination of criminal responsibility, 'mental illness' shall mean a substantial disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality or ability to meet the ordinary demands of life, but shall not include alcoholism which is defined in M. G. L. c. 123, § 35."

[9] Behavior which would support a finding of "likelihood of serious harm" is set out in G. L. c. 123, § 1: "(1) [A] substantial risk of physical harm to the person himself as manifested by evidence of threats of, or attempts at, suicide or serious bodily harm; (2) a substantial risk of physical harm to other persons as manifested by evidence of homicidal or other violent behavior or evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them; or (3) a very substantial risk of physical impairment or injury to the person himself as manifested by evidence that such person's judgment is so affected that he is unable to protect himself in the community and that reasonable provision for his protection is not available in the community."

[10] The application for extended commitment must include "the facts upon which the department bases its opinion that discharge from its control at the time stated would be physically dangerous to the public." See G. L. c. 120, § 17. The department's evidence also should indicate the facts on which the department bases its conclusion that it would be physically dangerous to the public to release the juvenile. If the department's evidence does not contain such facts, the judge is warranted in granting a juvenile's motion for directed finding.

sations were not confidential and could be used against him in a proceeding to extend his commitment. *Commonwealth* v. *Lamb,* 365 Mass. 265 (1974). *Commonwealth* v. *Barboza,* 387 Mass. 105, cert. denied, 459 U.S. 1020 (1982). We agree that the juvenile should have been warned. Because the juvenile did not raise this argument below, we next determine whether the failure to deliver such warnings created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Festa,* 388 Mass. 513, 515 (1983). We conclude that it does.

In *Commonwealth* v. *Lamb, supra* at 270, we said that, in a proceeding under G. L. c. 123A for commitment of a person convicted of a violent sex crime or a sexually dangerous person, G. L. c. 233, § 20B,[11] established a patient's right to "keep privileged any communications made to a court-appointed

---

[11] General Laws c. 233, § 20B (1984 ed.), provides in pertinent part: "The following words as used in this section shall have the following meanings: — "Patient", a person who, during the course of diagnosis or treatment, communicates with a psychotherapist; "Psychotherapist", a person licensed to practice medicine who devotes a substantial portion of his time to the practice of psychiatry or a person who is licensed as a psychologist by the board of registration of psychologists; provided that such person has a doctoral degree in the field of psychology; and "Communications" includes conversations, correspondence, actions and occurrences relating to diagnosis or treatment before, during or after institutionalization, regardless of the patient's awareness of such conversations, correspondence, actions and occurrences, and any records, memoranda or notes of the foregoing. Except as hereinafter provided, in any court proceeding and in any proceeding preliminary thereto and in legislative and administrative proceedings, a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition. If a patient is incompetent to exercise or waive such privilege, a guardian shall be appointed to act in his behalf under this section. A previously appointed guardian shall be authorized to so act. Upon the exercise of the privilege granted by this section, the judge or presiding officer shall instruct the jury that no adverse inference may be drawn therefrom. The privilege granted hereunder shall not apply to any of the following communications: — . . . (b) If a judge finds that the patient, after having been informed that the communications would not be privileged, has made communications to a psychotherapist in the course of a psychiatric examination ordered by the court, provided that such communications shall be admissible only on issues involving the patient's mental or emotional condition but not as a confession or admission of guilt."

psychotherapist in the case of a court-ordered examination, absent a showing that he was informed that the communication would not be privileged and thus, inferentially, that it would be used at the commitment hearing." Because the purpose of G. L. c. 120, §§ 16-20, is similar to that of G. L. c. 123A — to protect the public "against future anti-social behavior by the offender" and to rehabilitate him [*Commonwealth* v. *Rodriguez,* 376 Mass. 632, 646 (1978)] — there is no reason not to apply the same procedural safeguards to proceedings regarding sexually dangerous persons to those involving extended commitments for persons adjudicated delinquent.

The Commonwealth makes the anomalous argument that, because it did not seek a court order for the psychiatric evaluation, the *Lamb* warnings should not be required. That argument is without merit. The warnings are required by reason of G. L. c. 233, § 20B, see *Commonwealth* v. *Lamb, supra* at 267-268, and do not depend on whether the Commonwealth chooses to interview a person on its own initiative or decides to seek court permission. The requirement of warnings is not a matter of prosecutorial discretion.

The Commonwealth also contends that *Lamb* warnings were not required because Dr. Gibson did not disclose any communications from the juvenile at trial. Doctor Gibson, however, gave a diagnosis, which was based, at least in part, on conversations with the juvenile which were not preceded by any warnings. The juvenile was not warned that his interviews with Dr. Gibson were not confidential and could be used against him in a proceeding to extend his commitment. As we read the *Lamb* case, those interviews, if they were to be the basis of the expert's opinion, should have been preceded by the *Lamb* warnings.[12] "We cannot conclude in all fairness that the jury would not possibly have found this evidence significant in their consideration of the issue of [the juvenile's mental disorder and whether he was physically dangerous to the public]." *Commonwealth* v. *Schulze,* 389 Mass. 735, 742 (1983).

---

[12] On the view we take of this issue, we do not reach or decide whether the warnings are required as a matter of Federal or State constitutional law.

Because there is a substantial risk of a miscarriage of justice, we reverse and remand for a new trial.

3. We turn to issues likely to recur at a new trial.

a. *The expert opinion.* During the trial the Commonwealth's expert said that he reviewed the records at the Butler Center which included "family history, psychology . . . testing, medical and neurological histories as well as interviews . . . conducted by the [department's] case workers with [the juvenile's] mother." The expert relied on these reports as well as his own interviews with the juvenile. None of the reports was offered in evidence. On appeal, the juvenile asserts that the judge should not have permitted the expert to state his opinion because the expert relied on facts not in evidence.

The settled and traditional rule in Massachusetts is that "[t]he competency of an expert witness to testify to his opinion rests upon unusual knowledge and extraordinary experience, superior to that of ordinary persons. The witness, being qualified in this particular, then may base his opinion upon facts observed by himself or within his own knowledge and testified to by himself or upon facts assumed in the questions put to him and supported either by admitted facts or by the testimony of other witnesses already given or to be given at the trial, or upon facts derived partly from one source and partly from the other." *Commonwealth* v. *Russ,* 232 Mass. 58, 73 (1919). See *LaClair* v. *Silberline Mfg. Co.,* 379 Mass. 21, 32 (1979); *Commonwealth* v. *Harrison,* 342 Mass. 279, 287-288 (1961); McCormick, Evidence § 14 (3d ed. 1984); P.J. Liacos, Massachusetts Evidence 111 (5th ed. 1981). The Commonwealth cites to Proposed Mass. R. Evid. 703 as enlarging the basis for expert opinion. Because there is to be a new trial, we turn to consideration of Proposed Mass. R. Evid. 703. See Announcement Concerning the Proposed Massachusetts Rules of Evidence (December 30, 1982).

Proposed Mass. R. Evid. 703 provides: "BASES OF OPINION TESTIMONY BY EXPERTS The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by

experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." The proposed rule was taken verbatim from Fed. R. Evid. 703.

The first sentence of Proposed rule 703 tracks our current practice. The second sentence, however, which provides that an expert may base an opinion on facts or data *not admissible* in *evidence* "[i]f [the evidence is] of a type reasonably relied on by experts in the particular field" radically departs from our current practice. The Federal Advisory Committee states: "[T]he rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." See Advisory Committee's Note to Fed. R. Evid. 703, 28 U.S.C. App. 711 (1982 ed.).

"The proper inquiry is not what the court deems reliable, but what experts in the relevant discipline deem it to be." *In re Japanese Elec. Prods.*, 723 F.2d 238, 277 (3d Cir. 1983), cert. granted on other grounds, 471 U.S. 931 (1985), reversed and remanded sub nom., *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). See *Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 895-897 (3d Cir. 1985); *Wilder Enterprises v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1143-1144 (4th Cir. 1980). The rule has been construed broadly by the Federal courts. See, e.g., *United States v. Baca*, 687 F.2d 1356, 1361 (10th Cir. 1982) (expert could give opinion as to defendant's competence based on another doctor's evaluations); *United States v. Lawson*, 653

F.2d 299, 301-302 (7th Cir. 1981) (psychiatrist could base his opinion on staff reports, defendant's interviews with other physicians, information received from United States Marine Corps, reports from the F.B.I. and " 'a large amount of information' furnished by the United States Attorney's Office"); *Mannino* v. *International Mfg. Co.*, 650 F.2d 846, 853 (6th Cir. 1981) (expert in biomechanical engineering could testify on improper design based on literature and information furnished by plaintiff's attorney); *United States* v. *Bilson,* 648 F.2d 1238, 1239 (9th Cir. 1981) (psychiatrist could base his opinion of defendant's sanity on psychological tests administered by unlicensed psychologist); *Bauman* v. *Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980) (expert could rely in part on research done in university library); *O'Gee* v. *Dobbs Houses, Inc.*, 570 F.2d 1084, 1089 (2d Cir. 1978) (physician as expert allowed to testify to patient's version of other doctors' opinions, court noted that expert also had reports by two of the other doctors as well as a hospital report).[13] *American Universal Ins. Co.* v. *Falzone,* 644 F.2d 66, 66 (1st Cir. 1981) (no error to permit expert to consider "contemporaneous and on-the-scene opinions of other investigators on his team . . . as to [their] portion of the investigation"). "The way to combat such evidence is by cross-examination, not claiming foul." *Knightsbridge Mktg. Servs., Inc.* v. *Promociones Y Proyectos,* 728 F.2d 572, 576 (1st Cir. 1984). The various opinions construing rule 703 also may reflect the fact that in the Federal courts some of the evidence would be admissible under the

---

[13] The court did caution that "while expert witnesses are to be permitted to explain the basis of their opinions, we do not here decide that that leeway extends to the kind of multiple hearsay that would have been present here in the absence of the doctors' reports." *O'Gee* v. *Dobbs Houses, Inc., supra* at 1089.

residual exceptions for hearsay. See Fed. R. Evid. 803(24)[14] and 804(b)(5).[15]

Federal Rule of Evidence 703 has been described as raising a "serious potential for abuse." 1983 A.B.A. Sect. Litig., Emerging Problems Under the Federal Rules of Evidence 204, 210. "[B]y permitting experts to base opinions on data not admissible in evidence, Rule 703 encourages litigators to look for experts who will base their opinions, at least in part, on evidence that is otherwise inadmissible, but which the proponents of the experts would like the juries to hear. Whether or not using Rule 703 in this manner is an abuse, it is an increasingly common tactic." Arnolds, Federal Rule of Evidence 703; The Back Door Is Wide Open, 20 F. 1, 18 (1984). "Rule 703 allows the expert to give a courtroom opinion based on facts

---

[14] Federal Rule of Evidence 803(24) provides: "Other exceptions. — A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

[15] Federal Rule of Evidence 804(b)(5) provides: "(b) Hearsay exceptions. — The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"    . . . .

(5) Other exceptions. — A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

or data which may be, although need not be, admissible evidence. The broad language of rule 703 has, however, created uncertainty concerning the admissibility of material relied upon by the expert. The uncertainty focuses on whether the evidence is received as substantive proof, as a new exception to the hearsay rule, or whether the material may be mentioned only for the limited purpose of demonstrating what data the expert relied upon. This controversy has continued to plague the courts." (Footnotes omitted.) Carlson, Collision Course In Expert Testimony: Limitations On Affirmative Introduction of Underlying Data, 36 U. Fla. L. Rev. 234, 243 (1984). "Rule 703 is an undesignated thirtieth exception to the prohibition against hearsay. It authorizes trial judges to permit an expert witness to base his (or her) opinion testimony on inadmissible data conveyed to the witness outside the courtroom. And some of the cases go a long step farther and allow the expert, on his direct examination, to describe this inadmissible data to the factfinder. That is what is known as a back door and no matter how many limiting instructions you may have, it is an ominously large door." Waltz, Evidence is Dead, Wigmore Obsolescent: Long Live Judicial Discretion.[16] The rule "permits the jury to hear information that would normally be considered improper evidence." Rossi, Modern Evidence and the Expert Witness, 12 Litigation No. 1, 18, 24 (1985).

Because of the problems now arising under rule 703, we are not persuaded we should accept the principles of the proposed rule. We believe, however, that we should take a modest step by permitting an expert to base an opinion on facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion. Such a change will eliminate the necessity of producing exhibits and witnesses whose sole function is to construct a proper foundation for the expert's opinion.

---

[16] Remarks Delivered to Northwestern University's 23rd Annual Alumni-Faculty Luncheon (September 29, 1983), quoted in Arnolds, Federal Rule of Evidence 703: The Back Door Is Wide Open, 20 F. 1, 5 (1984).

If a party believes that an expert is basing an opinion on inadmissible facts or data, the party may request a voir dire to determine the basis of the expert opinion. If the facts or data are admissible and of the sort that experts in that specialty reasonably rely on in forming their opinions, then the expert may state that opinion without the facts or data being admitted in evidence.

Because the facts or data on which an expert may rely in formulating an opinion may not be in evidence, we next consider Proposed Rule 705. Proposed Mass. R. Evid. 705 provides: "The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." The Advisory Committee's Note on Proposed Rule 705 states that "[t]his is the Federal rule and is consistent with Massachusetts practice as regards the lack of necessity of prior disclosure of the basis for the opinion of the percipient expert. *Commonwealth* v. *Vaughn,* 329 Mass. 333, 335 (1952). Its effect upon foundation for the non-percipient expert may not be substantial, because under Massachusetts practice the 'scope and fullness of hypothetical questions is within the sound discretion of the trial judge.' W. B. Leach & P. J. Liacos, Massachusetts Evidence 120 (4th ed. 1967). The rule is aimed principally at the abuse of the hypothetical question. It does not eliminate the availability of the hypothetical question, but only the requirement of its use. . . . The thrust of the rule is to leave inquiry regarding the basis of expert testimony to cross-examination, which is considered an adequate safeguard. Expanded discovery techniques are viewed as affording advance knowledge for purposes of cross-examination. See Mass. R. Civ. P. 26-37, as amended; Mass. R. Crim. P. 14 & 23, 378 Mass. 874, 893 (1979); *Commonwealth* v. *Lewinski,* 367 Mass. 889, 901-903 (1975). Furthermore, it should be noted that it is within the court's discretion to require an initial disclosure of underlying facts or data."

We add a note of caution. The use of the word "may" in the second sentence does not permit a judge to exclude questions designed to elicit the underpinnings of the expert's opinion.

b. *Motion to quash summons*. At trial, the juvenile applied to the court to issue a summons for Tony Medeiros, another juvenile at the center, on the ground that Medeiros' testimony "will tend to show that [the juvenile] is not a person who poses a danger to the community." The department moved to quash the summons on the ground that compelling Medeiros to testify "would be injurious to his health and further that the subject is suicidal." After a hearing, the judge allowed the juvenile's motion to suppress evidence of the incident (a fight at the Center), and allowed the department's motion to quash summons of Mederios. On the record before us, we cannot say that the judge erred in excluding evidence of the incident.

c. *Motion for appointment of psychiatrist*. Pursuant to Mass. R. Crim. P. 41, 378 Mass. 918 (1979), the juvenile asked for the appointment of a psychiatrist to help him prepare his defense. He now contends that the trial judge erred in denying his motion. However, a motion for an expert was allowed "fee not to exceed $350.00." The essence of the juvenile's argument appears to be that "no psychiatrist would consider doing a psychiatric evaluation of [the juvenile] and then testify at trial for only $350.00." Because the juvenile neither objected to the amount of the fee at trial nor presented any evidence that the sum was inadequate, there is no basis for concluding that there was an error in establishing the ceiling.

We reaffirm that an indigent defendant is entitled to extra costs and fees to prevent him from being disadvantaged in preparing or presenting his case adequately. See *Commonwealth* v. *Lockley*, 381 Mass. 156, 160-161 (1980). The record does not disclose any reason to conclude that the amount awarded was insufficient to hire an expert. Nor is there any record support for the suggestion that more funds were needed to secure the testimony of an expert at trial. Thus, the juvenile's argument on this issue is without merit. We reaffirm our position that "a ceiling may be established on the amount which may be expended." Reporters' Notes to Mass. R. Crim. P. 41, Mass. Ann. Laws, Rules of Criminal Procedure at 589 (1979).

The judgment extending the commitment order is vacated, and the case remanded to the jury of six for a new trial.

*So ordered.*