## COMMONWEALTH *vs.* DAVID STARKUS.

No. 06-P-295.

Middlesex. March 5, 2007. - June 13, 2007.

Present: GELINAS, COWIN, & GRAHAM, JJ.

*Sex Offender. Evidence,* Sex offender, Police report, Hearsay, Expert opinion.
*Practice, Civil,* Hearsay, Instructions to jury.

In an action to commit the defendant as a sexually dangerous person pursuant
to G. L. c. 123A, § 12(*b*), police reports concerning incidents that involved
the defendant's rape of a fourteen year old girl and uncharged misconduct
relating to the rape qualified for admission in evidence under G. L. c. 123A,
§ 14(*c*), and any reference to the information therein by the qualified
examiners in their testimony or reports was permissible. [331-334]
In proceedings to commit the defendant as a sexually dangerous person pursu-
ant to G. L. c. 123A, § 12(*b*), the judge acted within her discretion in
excluding from evidence a report from a defense expert, where the defendant
failed to comply with a discovery order requiring him to provide the facts
and data underlying the testing and conclusions set forth in the expert's
report, and where the expert had not been designated as a qualified examiner
by the Commissioner of Correction. [334-335]
Evidence at the trial for the commitment of the defendant as a sexually
dangerous person pursuant to G. L. c. 123A, § 12(*b*), was sufficient to
prove that the defendant suffered from pedophilia, a mental abnormality
for purposes of G. L. c. 123A, § 1. [335-336]
A defendant whom the Commonwealth sought to commit as sexually danger-
ous person pursuant to G. L. c. 123A, § 12(*b*), could make no credible
claim that there was an error in the reference by the qualified examiners at
trial to the victim's statements or, even if there was error, that he suffered
any prejudice. [337-338]
A psychiatric or psychological record was admissible at proceedings for the
commitment of the defendant as a sexually dangerous person notwithstand-
ing the presence of hearsay in that report. [338-340]
No substantial risk of a miscarriage of justice arose from a judge's erroneous
instruction to the jury regarding the standard of proof at a trial to commit
the defendant as a sexually dangerous person, where the language in the
judge's instruction was more favorable to the defendant than the instruc-
tion to which he was entitled. [340]

CIVIL ACTION commenced in the Superior Court Department on
December 20, 1999.

The case was tried before *Judith Fabricant*, J.

*Edward B. Fogarty* for the defendant.

*Benjamin S. Halasz*, Assistant District Attorney, for the Commonwealth.

GRAHAM, J. After a jury trial in the Superior Court, the defendant, David Starkus, was found to be a sexually dangerous person and committed to the Massachusetts Treatment Center at Bridgewater (MTCB) for between one day and life. On appeal, Starkus argues that (1) the police reports pertaining to a 1978 offense should not have been admitted in evidence, nor should either qualified examiner have referred to the information contained therein; (2) the judge erred in excluding a report from a defense expert; (3) the evidence was insufficient to prove that the defendant suffers from a mental abnormality; (4) the victim's statements to the qualified examiners during the trial should not have been admitted in evidence; (5) a psychiatric or psychological report should have been excluded because it contained hearsay; and (6) the judge improperly instructed the jury on an element of the offense.

*Procedural background.* In 1990, Starkus was arraigned and pleaded not guilty to four counts of indecent assault and battery on a child under the age of fourteen, and two counts of rape of a child under the age of sixteen. In April of 1991, he withdrew his pleas of not guilty and pleaded guilty to all charges. For the rape convictions, he was sentenced to two concurrent State prison terms of from five and one-half to ten years. For the indecent assault and battery convictions, he received a sentence of from six to ten years, three years suspended, to run on and after the sentences for rape.

In December of 1999, shortly before Starkus's release from prison, the Commonwealth petitioned to have him committed as a sexually dangerous person pursuant to G. L. c. 123A, § 12(*b*).[1] A judge of the Superior Court found probable cause and com-

---

[1]General Laws c. 123A, § 12(*b*), inserted by St. 1999, c. 74, § 8, reads as follows: "When the district attorney or the attorney general determines that the prisoner or youth in the custody of the department of youth services is likely to be a sexually dangerous person as defined in section 1, the district attorney or the attorney general at the request of the district attorney may file a petition alleging that the prisoner or youth is a sexually dangerous person and stating sufficient facts to support such allegation in the superior court where

mitted Starkus for examination in accordance with the statute. A jury trial ensued pursuant to G. L. c. 123A, § 14(*a*),[2] after which he was found to be a sexually dangerous person and committed to the MTCB for the period of one day to life.

*Facts.* The jury could have found the following facts. Starkus, born in 1947, had a history of sexual misbehavior dating back to 1978. On December 9, 1978, Starkus, thirty-one years old and married, invited two fourteen year old girls, Karen and Jane (pseudonyms), into his trailer home while his wife was not there. Starkus plied both girls with alcohol and engaged them in conversation about sexual matters. While Jane was using the telephone, Starkus took Karen, who was drunk, into the bedroom and laid her on the bed. He kissed her and undressed her. He began to rape Karen orally, at which point she attempted to get away and made excuses to leave. Starkus digitally penetrated her, placed his penis in her mouth, and then raped her vaginally with his penis. He also told Karen that if she screamed he would kill her. Starkus left the bedroom and told Jane to come into the bedroom because he was going to make her a "non-virgin." The girls left and reported the rape immediately to Karen's father.

Starkus was arrested and a police investigation ensued. During the investigation, police spoke with two other girls, ages eleven and thirteen. Both girls told police that they had visited Starkus's trailer after school on about ten occasions, while his wife was away. During the visits, the conversations centered on sex and Starkus offered the girls alcohol, showed them pornographic books and magazines, and told them dirty jokes. He tickled them and played "truth or dare," during which he kissed one of them. One visit took place on the same date as the rape, and during that visit Starkus gave one of the girls a book entitled "Little Cora's Sex Diary," by Sally Irwin, which the girl gave to police.

The only charge brought as a result of Starkus's misconduct

the prisoner or youth is committed or in the superior court of the county where the sexual offense occurred."

[2]General Laws c. 123A, § 14(*a*), inserted by St. 1999, c. 74, § 8, provides in pertinent part: "The district attorney or the attorney general at the request of the district attorney may petition the court for a trial which shall be by jury unless affirmatively waived by the person named in the petition."

was one count of rape of a child related to the assault upon the fourteen year old victim. Starkus pleaded guilty to so much of the indictment as alleged assault and battery. He was sentenced to two years in the house of correction and placed in psychotherapy as a condition of parole. The psychiatrist who treated Starkus, one Martin J. Pildis, described him as "a man handicapped in his ability to cope in time of emotional stress" and as a man who suffers from "periodic episodic drinking." Pildis recommended continued therapy. As the result of his conviction, Starkus was also discharged from the United States Air Force on November 16, 1979.

By 1987, Starkus was forty years old and living in Woburn with his third wife and his stepdaughter, who was born in 1980. The governing offenses took place between 1987 and 1989. The pertinent facts were established through police reports, the transcript of the 1991 plea hearing, Starkus's statements provided during his incarceration, and trial testimony. Starting in 1987, Starkus stated that he began to invite his stepdaughter, the victim, to wrestle with him in his bed because he believed she enjoyed it. The victim's mother worked during the day and Starkus worked a night shift, leaving Starkus and the girl alone after school. While wrestling, Starkus stated that he would move the victim's clothes around to see her body, and he would also expose himself. When he called her to his bedroom, he would be lying on the bed, naked or with his bathrobe open and nothing on under it. He would tell her that he wanted to wrestle and start by doing "raspberries" on her stomach, and would then proceed to suck on her chest.

The victim told police that she knew wrestling meant that she would be sexually assaulted. She said that Starkus would stick his hands down her pants to touch her vagina, and would make her touch his erect penis. He also raped her vaginally with his penis.

His stepdaughter first revealed the assaults to her grandmother in the summer of 1989. She told her grandmother that "it's been happening for a long time." The victim's grandmother reported to police that the victim had been home alone with Starkus, after school, for at least a year. The victim testified as a voir dire witness in the case at bar and stated that the abuse

began at the end of second grade, in about 1988, and ended when she told her grandmother in the summer of 1989, before fourth grade.

Starkus was indicted on one count of indecent assault and battery on a child under the age of fourteen and two counts of rape of a child under the age of sixteen, each count alleging that the acts occurred on divers dates between September 1, 1987, and September 1, 1989. Starkus pleaded guilty to all charges, but denied that the offenses spanned two years. The prosecutor stated that if the case were to go to trial, the Commonwealth anticipated being able to show that the assaults began when the victim was in second grade and continued through third grade. Starkus admitted committing repeated assaults, but claimed that the crimes occurred entirely within a two-week to one-month period. The judge accepted the plea and sentenced Starkus to a State prison on each rape charge and suspended the State prison sentence on each of the four indecent assault and battery charges.

While in prison, Starkus participated in parts of several treatment programs. He twice completed the first three phases of a sexual offender treatment program, but when he was promoted to the fourth level, where the participants are no longer permitted to deny their involvement in the offense, Starkus dropped out. The records from his requests for parole in 1994, 1995, and 1996 indicate that parole was denied in each instance because Starkus lacked any insight into his behavior, minimized responsibility for his actions, and rationalized his criminal behavior.

In 1999, when the Commonwealth petitioned for Starkus's commitment as a sexually dangerous person, the petition at issue here, two qualified examiners were appointed. Each examiner reviewed the records relevant to Starkus's history, offenses, and treatment, and each examiner interviewed Starkus. Doctor Robert Joss testified and gave an opinion that Starkus's demonstrated interest in young girls spanned at least eleven years and showed a repetitive pattern that constituted the mental abnormality of pedophilia. Joss also testified that in his opinion, absent the successful completion of treatment, Starkus was likely to reoffend if he were not confined.

The second qualified examiner, one Dr. Ira F. Silverman,

similarly testified. Specifically, he was "impressed . . . that even after all these years, that Mr. Starkus, I don't think, has a clue as to why he engaged in the behavior that he did repeatedly, persistently." Silverman testified that Starkus's explanations for his behavior were notable for a lack of any indication that he was sexually aroused by contact with minor children. Silverman noted that Starkus's statements were contradicted by the clear evidence from his victims that he was aroused by this type of contact.

Silverman gave an opinion that Starkus's long history of deviant sexual arousal and contact with minor children was not normal and constituted a mental abnormality that most closely approximates pedophilia. Silverman further stated that when this mental abnormality was viewed in context with Starkus's minimal and superficial commitment to treatment and his failure to acknowledge the pattern of deviant sexual arousal that has been part of his life for many years, it was his opinion that Starkus was likely to reoffend if he were not confined to a secure facility.

Starkus testified and denied that he was sexually attracted to the fourteen year old victim, but he acknowledged that he had raped her. Starkus also admitted playing "truth or dare" with the eleven and thirteen year old girls and that he kissed the older child on the cheek, but he said it occurred at a family picnic. He said it was "not sexual." Starkus denied virtually any sexual attraction to young girls, including the fourteen year old he raped. Starkus only acknowledged that he was sexually attracted to the breast area of his eight year old stepdaughter.

*Discussion.* 1. *Police reports.* Starkus argues that the police reports related to the 1978 incidents should have been excluded under his interpretation of G. L. c. 123A, § 14(*c*), which reads as follows:

> "Juvenile and adult court probation records, psychiatric and psychological records and reports of the person named in the petition, including the report of any qualified examiner, as defined in section 1, and filed under this chapter, *police reports relating to such person's prior sexual offenses*, incident reports arising out of such person's incarceration or custody, oral or written statements prepared for and to be offered at the trial by the victims of the person

who is the subject of the petition and any other evidence tending to show that such person is or is not a sexually dangerous person shall be admissible at the trial if such written information has been provided to opposing counsel reasonably in advance of trial" (emphasis added).

According to Starkus, the only prior offense to which the 1978 police reports related was his conviction for assault and battery. Starkus argues that because assault and battery is not a sexual offense, the police reports pertaining to that offense do not qualify for admission under the statute because they do not involve a prior *sexual* offense.

The argument is unpersuasive. It is clear that a defendant may be convicted of assault and battery on an indictment which charges rape, because assault and battery is a lesser included offense. *Commonwealth* v. *Richmond*, 379 Mass. 557, 562 (1980). *Commonwealth* v. *Eaton*, 2 Mass. App. Ct. 113, 118 (1974). Assault and battery only requires proof of an intentional and unjustified touching. *Commonwealth* v. *Ford*, 424 Mass. 709, 711 (1997).[3] Whether the touching is sexual or nonsexual is irrelevant to proof of the crime. There is certainly no requirement that the touching be nonsexual. Here, Starkus was able to negotiate a very favorable plea bargain, but that does not negate the underlying and undisputed fact that the incident involved the rape of a fourteen year old girl. In these circumstances, we have no difficulty concluding that the police reports comport with the requirement of the statute.

Starkus also argues that the follow-up report by police, written approximately three weeks after the rape, on January 3, 1979, should have been excluded because it contained uncharged misconduct. The report was of an interview conducted during the rape investigation with two girls, ages eleven and thirteen. The girls told police that they had visited Starkus at his trailer on at least ten occasions and that he had engaged them in sexual discussions and offered them alcohol. During one visit, which took place several hours before the rape, Starkus gave one of the girls a book entitled "Little Cora's Sex Diary."

---

[3] Assault and battery may also be proved under a second theory by the "intentional commission of a wanton or reckless act (something more than gross negligence) causing physical or bodily injury to another." *Commonwealth* v. *Burno*, 396 Mass. 622, 625 (1986).

Section 14(*c*) of the statute provides for the admission of "police reports *relating to* such person's prior sexual offenses" (emphasis added). The phrase "relating to" has been broadly defined in the decisional law as including not only the facts that are directly relevant to the crime charged, but also "to any statements describing the defendant's conduct and the circumstances attendant to the offense." *McHoul, petitioner,* 445 Mass. 143, 148 (2005), cert. denied, 547 U.S. 1114 (2006), quoting from *Commonwealth v. Given,* 441 Mass. 741, 745 (2004), cert. denied, 543 U.S. 948 (2004). For example, in *Commonwealth v. Given,* 441 Mass. 741 (2004), the court ruled that a police report that included statements from the victim describing the defendant's contemporaneous sexual abuse of a six year old boy was properly admitted. The court ruled that "[t]he fact that that information could have, but did not, result in additional criminal charges is irrelevant to its admissibility under § 14(*c*)." *Id.* at 745.

Here, the police report at issue, like in *Given,* included information that was relevant to the crime charged because it was relevant to show a pattern of conduct and the probable existence of the same passion or emotion at the time in issue. See, e.g., *Commonwealth v. Hanlon,* 44 Mass. App. Ct. 810, 818 (1998). In addition, the visits described by the young girls occurred close in time to the rape, with one of the visits occurring within hours of the charged crime. In these circumstances, there was no error in the admission of the police report.

Even if we were to conclude otherwise, the error was not prejudicial because Starkus testified at trial and admitted that he had raped the fourteen year old in 1978, and that he had offered the eleven and thirteen year old girls alcohol, played "truth or dare" with them, and kissed one of the girls.

Similarly unavailing is Starkus's related contention that neither qualified examiner should have been allowed to testify to the information contained in the police reports from the 1978 incident, or to include that information in their own reports. Because the police reports were properly admitted in evidence, any reference to the information therein, whether through testimony or in the report of either qualified examiner, was permissible. See *Commonwealth v. Markvart,* 437 Mass. 331, 338-339 (2002) (qualified examiner may refer to facts that are

in evidence); *McHoul, petitioner,* 445 Mass. at 146, 148 n.4 (same).

2. *Exclusion of report by defense expert.* Starkus was examined by his own expert, one Dr. Joseph J. Plaud, a licensed forensic psychologist, but not a qualified examiner. Plaud wrote a report in which he concluded that "[t]he results obtained in this assessment are not consistent with profiles of predatory sexual offenders" and "do not support the conclusion that . . . Starkus necessarily represents a danger to the community." Plaud's conclusion was based on a review of "the record," a "clinical interview" with Starkus, and six other specifically identified psychological assessments. Four months before trial began, the prosecutor obtained a discovery order requiring Starkus to provide the facts and data underlying the testing and conclusions set forth in Plaud's report. See *Department of Youth Servs. v. A Juvenile,* 398 Mass. 516, 531 (1986); *McHoul, petitioner,* 445 Mass. at 148 n.4. The information was never turned over to the prosecution or, for that matter, to Starkus's attorney. Even when the judge gave Plaud more time to produce the material during trial, it did not materialize.[4]

As a result, Starkus's attorney decided not to call Plaud as a witness because he did not want him to "testify about something that he can't back up," and instead, the attorney sought to introduce only Plaud's report. The judge excluded the report on the ground that none of the underlying facts or data on which Plaud had relied in forming his opinion had been turned over to the Commonwealth.

On appeal, Starkus argues that because Plaud possessed the education, training, and experience required to be a qualified examiner, his report should have been admitted under § 14(*c*)

---

[4]There was substantial discussion at trial about Plaud's failure to provide this material, as well as the more specific claim challenging the scientific reliability of the "Abel Screening" test Plaud performed. The Commonwealth argued that prior to the admission of the Abel Screening test, a hearing was required to assess the test's scientific reliability. See *Commonwealth* v. *Lanigan,* 419 Mass. 15, 26 (1994); *Ready, petitioner,* 63 Mass. App. Ct. 171, 175 (2005) (trial judge properly concluded that the "Abel Assessment for Sexual Interest [AASI]" test was neither generally accepted in the relevant scientific community nor demonstrated to be reliable).

As to the other tests performed by Plaud, the Commonwealth only wanted the underlying facts and data in order to effectively challenge Plaud's conclusions.

as a "report of [a] qualified examiner." As the trial judge correctly noted, however, only the Commissioner of Correction can designate a qualified examiner under G. L. c. 123A, § 1. Plaud had not been so designated, and there is no statutory provision for exemption from this requirement.

Starkus also argues that his due process rights were violated when the judge refused to admit Plaud's report pursuant to G. L. c. 123A, § 14(*c*), as a "psychiatric [or] psychological record[]." Regardless of whether the report qualifies as such a record, due process does not include the right to distort the fact-finding process by foreclosing the Commonwealth from being able effectively to rebut the conclusions proffered by Starkus's expert. See *Commonwealth* v. *Connors*, 447 Mass. 313, 318-319 (2006). Here, the failure to comply with the discovery order divested the Commonwealth of the ability to challenge the expert's conclusions contained in the report, and as a result, the judge acted within her discretion in excluding the report. See *Commonwealth* v. *Chappee*, 397 Mass. 508, 518 (1986).

3. *Sufficiency of the evidence.* Starkus also argues that the Commonwealth's evidence failed to prove beyond a reasonable doubt that he is a sexually dangerous person as defined by G. L. c. 123A, § 1, as amended by St. 1999, c. 74, § 6. The statute defines a sexually dangerous person as "any person who has been . . . convicted of . . . a sexual offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in sexual offenses if not confined to a secure facility." Specifically, Starkus complains that the evidence was insufficient to prove that he suffers from a mental abnormality. The term "mental abnormality" is defined in the statute as a "congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." G. L. c. 123A, § 1, inserted by St. 1999, c. 74, § 4. *Commonwealth* v. *Bradway*, 62 Mass. App. Ct. 280, 290 (2004).

Silverman, one of the two qualified experts, explained that the statute defines "mental abnormality" in much more general terms than does the American Psychiatric Association's Diagnostic and

Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV). Relying on the statute's definition, Silverman gave an opinion that Starkus's "long history of deviant sexual arousal and contact with minor children" is a "clear indication of mental abnormality." Silverman's testimony was supported by the evidence and, viewed in the light most favorable to the Commonwealth, was sufficient to establish that the defendant suffered from a mental abnormality. See *Johnson* v. *Summers*, 411 Mass. 82, 86 (1991), cert. denied, 502 U.S. 1093 (1992); *McHoul, petitioner,* 445 Mass. at 157 ("[t]he means to test the sufficiency of the evidence at a civil jury trial is by motion for directed verdict").

Starkus further argues that in order to establish a mental abnormality, the Commonwealth had to prove that he suffered from a mental abnormality included in the DSM-IV. We note, however, that the sexually dangerous persons statute makes no reference to this manual, nor does it set forth any requirement that the statutory definition of mental abnormality be limited to the abnormalities outlined in the DSM-IV. Cf. *Doe, Sex Offender Registry Bd. No. 1211* v. *Sex Offender Registry Bd.,* 447 Mass. 750, 765 n.13 (2006) ("[p]edophilia is a psychiatric disorder, not a legal classification"). Even if we were to assume that the mental abnormality must be one included in the DSM-IV, the evidence is sufficient to show that Starkus suffered from such an abnormality, namely, pedophilia. The manual states that a diagnosis of pedophilia requires "[a] period of at least six months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 or younger)." Starkus claims that because he testified at trial and at his plea hearing that the abuse of his stepdaughter lasted no more than several weeks, the six-month period of sexual activity necessary to show pedophilia had not been established.

The jury, however, were not required to credit Starkus's version of events. The police reports and the victim's statements permitted the conclusion that the abuse spanned at least a year. This evidence, particularly when viewed in the light most favorable to the Commonwealth, was sufficient to show that Starkus suffered from pedophilia, a recognized mental abnormality set forth in the DSM-IV.

4. *Victim's statements to qualified examiners*. Doctor Joss testified, over objection, that during the course of the trial he had spoken by telephone to Starkus's stepdaughter, who told him that Starkus began sexually assaulting her in 1987, when she was in second grade, and that the assaults stopped in 1989, during the summer before she entered fourth grade. Doctor Silverman also testified that he had spoken with the victim during the trial and that she had provided the same information to him.[5] The victim was called by the Commonwealth as a voir dire witness and confirmed that she had been repetitively assaulted from 1987 to 1989.[6]

On appeal, Starkus challenges the propriety of Joss and Silverman relying on the information they received from the victim because he contends that the information does not fall into one of the categories upon which an expert may base his or her opinion. "Qualified examiners, as expert witnesses, may base their opinions on (1) facts personally observed; (2) evidence already in the records or which the parties represent will be admitted during the course of the proceedings, assumed to be true in questions put to the expert witnesses; and (3) *'facts or data not in evidence if the facts or data are independently admissible* and are a permissible basis for an expert to consider in formulating an opinion.' " *Commonwealth* v. *Markvart*, 437 Mass. at 337, quoting from *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. at 531. The victim's statements, describing her own experience, clearly constitute independently admissible

[5]Starkus did not object to Silverman's testimony regarding his conversations with the victim.

[6]This information was neither new nor a surprise. The record plainly suggests that the victim had consistently described the assaults as having taken place for more than a one year period, between 1987 and 1989. For example, the indictments, which were based on evidence presented to a grand jury, charged divers date offenses between September 1, 1987, and September 1, 1989. The police reports suggest at least a one-year period of chronic sexual abuse. The transcript of the plea hearing reflects that the Commonwealth was prepared to prove that the incidents occurred between September 1, 1987, and September 1, 1989, when the victim was in the second and third grade. The prosecutor reiterated this point during the trial in the case at bar. She acknowledged that while Starkus has consistently maintained that he only assaulted the victim for several weeks, the Commonwealth has always been prepared to prove through the testimony of the victim that she was repeatedly assaulted for over a year between 1987 and 1989.

evidence and, therefore, may properly be relied upon by a qualified examiner to render an opinion.

Starkus also argues that the victim's statements to the qualified examiners during trial should have been excluded because they were not timely disclosed. According to Starkus, G. L. c. 123A, § 14(c), and due process require that such statements be supplied in advance of trial. The record makes clear, however, that beginning with the indictment in 1990 through to the probable cause hearing that preceded the trial in the case at bar, the Commonwealth was prepared to offer the victim's testimony, if necessary, to establish that the repeated assaults took place over more than a one-year period. Starkus's attorney acknowledged that he was aware of the Commonwealth's position regarding the length of time the victim had been assaulted. In these circumstances, Starkus can make no credible claim that there was an error in the reference by the qualified examiners to the victim's statements or, even if there was error, that he suffered any prejudice.

5. *Pildis report.* Starkus acknowledges that the report written by Martin J. Pildis, a psychiatrist, is a "psychiatric [or] psychological record[]" identified as being admissible under § 14(c), but he argues that it was error to admit the report without redacting the hearsay opinions of Drs. Riceman and Jacobs. The argument no longer has vitality in light of *McHoul*, which establishes that the specifically identified reports and records set forth in G. L. c. 123A, § 14(c), are admissible notwithstanding the presence of "totem pole" or "layered" hearsay. *McHoul, petitioner,* 445 Mass. at 146-153.

In *McHoul*, the Supreme Judicial Court ruled that the trial judge had properly admitted in evidence certain records and reports without redacting the "totem pole" hearsay contained therein, where those reports were among those made admissible under G. L. c. 123A, § 9.[7] *Ibid.* The *McHoul* court recognized that absent these statutory provisions, such documents and the information therein "would ordinarily be excluded as inadmis-

---

[7]General Laws c. 123A, § 9, as appearing in St. 1993, c. 489, § 7, allows for "[a]ny person committed to the treatment center . . . to file a petition for examination and discharge once in every twelve months." Section 9 lists a variety of records and documents admissible at such proceedings that are similar to those admissible in § 14 proceedings.

sible hearsay." *Id.* at 147. The court reasoned that redacting portions of the reports made admissible by statute would result in the elimination of "vast amounts of information" and render submitted records so "riddled with holes and gaps as to be useless." *Id.* at 150. For purposes of determining sexual dangerousness, the court concluded that the records and reports made admissible by statute have sufficient reliability to meet due process requirements, regardless of the inclusion of hearsay. See *id.* at 151-152 & n.7. In sum,

> "[t]hese records and reports provide information that is especially pertinent to the assessment of a person's mental condition and present sexual dangerousness; that information is often difficult or impossible to present at trial by other means; and the information has been preserved in records of a type that the Legislature views as sufficiently reliable for these purposes. We accept the Legislature's determination at face value, and do not superimpose our own rules of evidence contrary to the Legislature's determination."

*Id.* at 152 (footnote omitted).

The decision in *Commonwealth* v. *Markvart, supra,* is not to the contrary. In that case, the court acknowledged that hearsay not otherwise admissible under the rules of evidence may be admitted at the trial of a sexually dangerous person, where it has been "specifically made admissible by statute." *Commonwealth* v. *Markvart,* 437 Mass. at 335. The relevant issue in *Markvart,* however, was not whether hearsay should be redacted from a document that fell within the parameters of § 14(*c*), as is the issue in the case at bar but, rather, whether the document in any form was admissible under § 14(*c*). *Id.* at 335-336.

Specifically, the prosecutor sought to admit, either directly or through expert opinion, police reports and witness statements related to charges that had been nol prossed. *Id.* at 332-333. According to the Commonwealth, the materials constituted police reports relating to such person's prior *sexual offenses* that are made admissible by § 14(*c*). The court held however, that the term " 'prior offenses' necessarily implies findings of guilt." *Id.* at 336. Moreover, "without a conviction or adjudication, the allegations in the nol prossed case materials are just that: alle-

gations." *Ibid.* The court ruled that "[t]hey do not constitute reports of 'prior sexual offenses' " and are not directly admissible under that statute. *Ibid.*

The court's analysis did not end at this point, but turned to "the question whether material from [a] nol prossed case . . . may [otherwise] be used as a basis for the qualified examiner's opinion." *Ibid.* The court applied the traditional analysis for making such determinations set forth in *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. at 531, and *Commonwealth* v. *Jaime*, 433 Mass. 575, 577-578 (2001). See *Commonwealth* v. *Markvart*, *supra* at 336-339.

In the case before us, however, we need look no further than the language of § 14(*c*) to determine whether the Pildis report is admissible without redaction. Unlike the situation presented in *Markvart*, there is no dispute in this case that the document at issue falls within one of the categories set forth in § 14(*c*). Section § 14(*c*) expressly provides for the admission of "psychiatric and psychological records." Therefore, as the *McHoul* decision makes clear, it is admissible notwithstanding the presence of "totem pole" or "layered" hearsay.

6. *Standard of proof.* Finally, Starkus argues that the judge erred when she instructed the jury that the phrase "likely to engage in sexual offenses" means "there is a substantial likelihood that [Starkus] will commit [a] sexual offense." See G. L. c. 123A, § 1. The judge's instruction was erroneous. See *Commonwealth* v. *Boucher*, 438 Mass. 274 (2002). However, in this case, we find no substantial risk of a miscarriage of justice, see *Commonwealth* v. *Belcher*, 446 Mass. 693, 696 (2006), because "the added language made the jury instruction more favorable to the defendant than the instruction to which he was entitled." *Commonwealth* v. *Stovall*, 22 Mass. App. Ct. 737, 744 (1986).

*Judgment affirmed.*