ADOPTION OF SETH.

No. 89-804.

Middlesex. February 15, 1990. - October 9, 1990.

Present: ARMSTRONG, KASS, & JACOBS, JJ.

*Adoption*, Dispensing with parent's consent. *Parent and Child*, Dispensing
with parent's consent to adoption. *Constitutional Law*, Impartial tribu-
nal. *Judge. Evidence*, Questioning of witness by judge, Expert opinion,
Hearsay, Communication between patient and psychotherapist, Privi-
leged communication. *Practice, Civil*, Questioning of witness by judge.
*Witness*, Expert. *Psychotherapist. Privileged Communication.*

In a proceeding to dispense with parental consent to adoption, the judge's
suggestions, orders, and comments during the trial did not demonstrate
that the judge was not impartial. [350-351]
In a proceeding to dispense with parental consent to adoption, the judge
erred in admitting testimony of a psychiatrist that described and de-
pended on various hospital records diagnosing the mother's mental con-
dition, where the records were both hearsay and privileged [351-353];
however, no substantial prejudice to the mother was shown inasmuch as
the judge's conclusion that the mother was unfit to care for her child
was overwhelmingly supported by nonprivileged testimony of the guard-
ian ad litem and of social workers. [353-354]

PETITION filed in the Middlesex Division of the Probate
and Family Court Department on September 18, 1987.

The case was heard by *Edward M. Ginsburg*, J.

*Vida K. Berkowitz* for the mother.

*Jon Laramore*, Assistant Attorney General, for Depart-
ment of Social Services.

*Robert F. Murphy, Jr.*, for the minor.

JACOBS, J. Seth was three weeks old when the Department
of Social Services (department) removed him from his
mother's home and obtained temporary legal custody pursu-
ant to G. L. c. 119. Approximately one year later, the de-
partment filed a petition under G. L. c. 210, § 3, to dispense

with parental consent to adoption. On nine occasions, a District Court reviewed and renewed the original temporary custody order. When Seth was two and one-half years old, a Probate Court judge, acting under special assignment, heard both the care and protection and the G. L. c. 210, § 3, petitions.[1] After a four-day trial, the judge filed comprehensive findings of fact and conclusions of law. Among the latter were his conclusions that Seth's mother and father were unfit to care and provide for their son and that it was in the child's best interests that the G. L. c. 210, § 3, petition be allowed.

Neither of Seth's parents appeals the award of permanent custody to the department pursuant to G. L. c. 119, and only the mother[2] appeals from the decree entered under G. L. c. 210, § 3, dispensing with parental consent to adoption. The mother claims that the judge "stepped entirely out of the role of neutral arbiter and became an advocate for the [department]," thereby violating her right to due process. She also argues that she was substantially prejudiced by the erroneous admission in evidence of communications between her and her psychotherapist, contrary to G. L. c. 233, § 20B.[3] We find neither prejudice nor due process violation and, therefore, affirm the decree.

At the time of the trial, the mother was a patient at a mental health facility. Counsel for the department, in her opening statement, referred to the mother as suffering from

---

[1]Provisions for special assignment and simultaneous hearing are contained in G. L. c. 210, § 3(*b*), and c. 211B, § 9. See *Custody & Adoption of Ned*, 28 Mass. App. Ct. 557, 560 (1990).

[2]The judge found that "[t]he father . . . has no interest in these proceedings." Nothing before us indicates otherwise.

[3]General Laws c. 233, § 20B, as inserted by St. 1968, c. 418, provides in pertinent part that, "in any court proceeding . . . , a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between [a] patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition." The statute defines "communications" as including "conversations, correspondence, actions and occurrences relating to diagnosis or treatment . . . , and any records, memoranda or notes of the foregoing." "Psychotherapist" is defined to include licensed physicians devoting substantial time to the practice of psychiatry and certain licensed psychologists and psychiatric nurses.

"mental disorders" and to her long history of hospitalizations. There followed the testimony of a department social worker who made repeated reference to the mother's involvement with mental health treatment. The judge, reasonably assuming that the department's case was grounded principally on evidence of specific mental illness, interrupted this testimony to inquire of department's counsel, who apparently was inexperienced in these matters,[4] "Are you going to have a psychiatrist testify as to her diagnosis and prognosis?" The response was "[N]o . . . . We will go with the [guardian ad litem's] report, the records, the [social] workers."

Repeated judicial suggestions that a "mental health person" ought to testify prompted department's counsel to state that she was prepared to argue the admissibility of the records of the mother's psychiatric treatment. Noting that the records consisted of sixteen envelopes standing two feet high, the judge stated: "[T]hat's not how these things are supposed to be done." Counsel for the department did not press further to have the records admitted directly in evidence. Instead, during the testimony of the guardian ad litem, she offered to introduce his entire report, appended to which were the same records of psychiatric treatment. When counsel for the mother objected, on hearsay grounds, to the admission of the appended records, the judge sustained the objection and allowed only the report to be admitted. The apparent reliance by department's counsel on the contents of the records of the mother's treatment caused the judge to make several further suggestions that the testimony of a psychiatrist be offered. Eventually, he unequivocally ordered her to have a psychiatrist in court "right away" and refused a request for a continuance, noting that it would result in the loss of court time which had been set aside for the case. The next day, counsel for the department offered the testimony of a psychiatrist who had never treated or seen the mother. After the psychiatrist testified to her qualifications, she requested an opportunity to review the mother's treatment

---

[4] Appellate counsel for the mother, in her brief, concurs with this observation.

records. The judge suspended the hearing for that day, describing "[w]hat would be helpful, what I think I would like from [the psychiatrist]."[5]

On the following day, the psychiatrist testified on the basis of her review of the report of the guardian ad litem, the notes of a department social worker, and the records of some of the mother's hospitalizations. After sustaining objections to several questions put to the psychiatrist by the department's counsel, the judge made suggestions as to the form of questions to be asked and finally posed questions directly to the witness. The psychiatrist testified to the mother's history and psychiatric diagnoses as contained in the hospital records. She also described the behavioral manifestations of such diagnoses and opined as to the mother's current parental fitness and prognosis.

During the first day of the psychiatrist's testimony, counsel for the mother indicated that she might have some problem with "privileged information" contained in the records reviewed by the psychiatrist and with "hearsay . . . as the basis of the expert's opinion," but made no objection to the forced production of the witness.[6] Thereafter, counsel for the mother successfully objected to certain preliminary questions put to the psychiatrist by the department's counsel but, somewhat understandably, fell silent when the judge took over the questioning.

Prior to the psychiatrist's testimony, the judge peppered the proceedings with commentary on the evidence. His effu-

---

[5]The judge stated, "[Y]ou can recite what the record gives as her diagnosis and what the basis of it is. You can describe all of the symptoms, and then I suppose you can, on the basis of the symptoms that you have heard, are they consistent with what you would find as a diagnosis if that's all you had and then what it means in terms of this case, in terms of her capacity, her fitness to be a custodial parent and then . . . the prognosis. That is what I would like to have from you . . . ." The judge also suggested that "a good hypothetical question" be attempted by the department's counsel the next day, but abandoned that suggestion after objection by the mother's counsel.

[6]At one point, counsel for the mother noted her lack of opportunity to prepare for the psychiatrist's testimony. However, she went on to state, "I am not objecting to her testimony. I understand the situation, your honor."

sions ranged from references to psychiatric evidence as "the essential element of the case" to a statement that "I don't think the case is going to turn on it." On one occasion, he intimated that he was left to decide "on surmise." On another, he stated that "probably the facts are not close." He also expressed concern over how an appellate court would view the proceedings.

Notwithstanding the judge's insistence upon the department offering psychiatric testimony and his involvement in the examination of the psychiatrist, his findings, for the most part, were not dependent on that testimony. Fifty of fifty-one of his subsidiary findings were based on the evidence introduced through the social workers and the guardian ad litem. We summarize those findings. The mother was thirty years old and unmarried when Seth was born. The father, who never married the mother, was in prison both at the time of the child's birth and at the time of the trial. The mother had first been a patient at a mental health facility when she was fourteen years old. As of the time of the trial, she had a nineteen-year history of psychiatric intervention, had experienced lengthy hospitalizations, both voluntary and involuntary, and had been an inpatient at a mental health facility for the last nine months. The judge found that the care and protection petition had been filed as a result of the department having received reports of the mother experiencing psychological problems and that "[s]he became extremely stressed while caring for [Seth]." When the department first acquired legal custody of Seth, he was placed in the physical custody of the mother's parents. After two weeks of this arrangement, Seth's grandmother notified the department that she was unable to care for such a young child and requested that he be removed from her home. For approximately two years thereafter, Seth resided with foster parents.

The mother's contact with Seth for the two-year period following his removal from her custody consisted of weekly visits of no more than two and one-half hours duration. All but three of the visits were supervised by department personnel. The judge found that the unsupervised visits were termi-

nated by the department due to the mother's inability to care for Seth by herself. For approximately a year and one-half, the visits generally took place at the mother's apartment. Thereafter, they took place at the mental health center at which she was a patient. All visitation arrangements were made by the department. At no time did the mother attempt to increase the frequency or time of visitation.

During Seth's placement in foster care, the department attempted to teach the mother how properly to care for him. Department personnel provided homemaker services to the mother and demonstrated parental skills during the visitations. The department also attempted to implement several service plans directed at assisting the mother in acquiring such skills. The judge found that she was "extremely resistant to the services provided for her."

The mother never learned to diaper or feed Seth properly. During visits she was unable to focus her attention on her child. She spent much of her visitation time discussing with her social worker the problems she had experienced with various support agencies and professionals. During such discussions she ignored the child's presence. As a result of the mother's inattention during various visits, Seth endangered himself on several occasions. During one of the three unsupervised visits, the mother locked herself out of her apartment with the child inside. The judge found that "[s]he panicked at not being able to solve this problem and relied on the social worker to gain access to the apartment." He also found that "[h]er actions during visits demonstrated that she did not have any insight into the care of her minor child" and that she was generally unaware of safety hazards. The judge further found that the mother had alienated herself from her family and from much of the community support which had been available to her. Some of this alienation was the result of her penchant for making repeated and harassing telephone calls to persons attempting to help her.

After Seth had been in foster care for two years, the department shifted its focus from attempting reunification of Seth with his mother to planning for his adoption. As a re-

sult, visits were reduced in frequency to once a month. During the nine months before trial, the visits with his mother at the mental health center were extremely stressful to Seth and often caused him to vomit and sob prior to, during, and after the visits.

The mother admitted to her social worker that she was unable to care for her child or tolerate him for any period longer than a few hours. As of the time of the trial, the mother had given up the lease on her apartment and did not have a place to live aside from the mental health facility in which she was a patient. The judge found that, despite the efforts of both the mother and the department, she never learned to care for her child adequately. He also found that she was unable to provide a safe and stable environment for him.

The judge, in findings which specifically were supported by the unobjected-to report and testimony of the guardian ad litem, detailed various mental disorders suffered by the mother and described how these disorders manifested themselves in "mood fluctuations, impulsive self-destructive behavior, suicidal threats and antisocial behavior." He concluded that the mother was "incapable of dealing with everyday problems that arise while parenting" and did not have "the ability or capacity to assume parental responsibility for [Seth]." He further found that there was "no projected time when the mother will be able to assume parental responsibility." In a paragraph entitled "Discussion," the judge stated that the mother's "mental disorder prevents her from effectively parenting [Seth]."

As of the time of trial, Seth was in good health and had been living with his proposed adoptive parents for over four months. He had been accepted by them as a member of their family and was interacting well with them.

The finding which relied primarily on the testimony of the psychiatrist specifically described various diagnoses of the mother's mental state which had been made over the years and included a brief description of the behavioral characteristics of those disorders. It also contained the conclusion that

"[t]he mother's prognosis is poor" and that she was "unlikely to develop the skills necessary to parent [Seth]."

*Judicial conduct.* Article 29 of the Massachusetts Declaration of Rights guarantees to every citizen the right "to be tried by judges as . . . impartial . . . as the lot of humanity will admit." The mother argues essentially that the judge, by his words and actions during the trial, betrayed a bias in favor of the department and denied her the impartial justice to which she was entitled. The mother confuses the judge's extraordinary, and perhaps inappropriate, involvement and commentary with a lack of impartiality. A close reading of the transcript of the trial indicates no violation of the "strict and lofty standard" of art. 29. *King* v. *Grace*, 293 Mass. 244, 247 (1936). Contrary to the perceptions of some,[7] a judge is "not a mere functionary to preserve order and lend ceremonial dignity to the proceedings" but rather "the directing and controlling mind at the trial." *Whitney* v. *Wellesley & Boston St. Ry.*, 197 Mass. 495, 502 (1908). A judge is expected to be more than a referee. *Commonwealth* v. *Hanscomb*, 367 Mass. 726, 732 (1975) (Hennessey, J., concurring). He "need take no vow of silence," *Commonwealth* v. *Haley*, 363 Mass. 513, 519 (1973), quoting Lummus, The Trial Judge 19 (1937). Today, when judges are expected to be docket managers, the interests of efficiency often impel them to become more openly involved in avoiding unnecessary continuation and retrial of their cases than in more leisurely times.

The judge did not assume an active role in this action until the second day of trial. By then, he had heard the testimony of two social workers which, for the most part, established the department's case. It was only then that he began to suggest that a psychiatrist be called to testify. Whether that involvement was spurred by a mistaken notion of the dependence of the department's case on psychiatric evidence or by

---

[7]Roscoe Pound, decrying what he thought to be a departure from the English model, wrote, "[S]o far as our trial courts are concerned, the judge is very like the wooden Indian that used to stand out in front of the old-time tobacco shop — dignified, imposing, mysterious and strictly ornamental." The Judicial Office in America, 10 B.U.L. Rev. 125, 127 (1930).

an understandable desire to avoid retrial is immaterial. What is significant is that his suggestions, orders, and comments were based on impressions formed from participation in the case and not from prejudicial information gleaned from an extrajudicial source. An opinion, developed from information acquired in the course of presiding over a case, does not disqualify a judge from rendering a decision in that matter. *United States* v. *Grinnell Corp.*, 384 U.S. 563, 583 (1966). *Kennedy* v. *Justice of the Dist. Ct.*, 356 Mass. 367, 379 (1969).

A judge has the right and, in some circumstances, the duty to participate in the examination of a witness. *Commonwealth* v. *Festa*, 369 Mass. 419, 422 (1976). The participation of the judge in the questioning of the psychiatrist was primarily a reflection of impatience with the inability of department's counsel to pose proper questions. If he was overzealous in becoming so involved, the error was harmless in view of our conclusion, set forth below, that no prejudice resulted from the testimony of the psychiatrist.

The mother, by selective focus on some of the judge's remarks, argues they are proof of his reliance, in his findings, on erroneously admitted psychiatric evidence. Selective focus on other of his remarks, however, supports the opposite conclusion. In any event, such random comments during this trial, while better unspoken, at most reflect initial impressions and should not be permitted to restrict or color the judge's ultimate written findings, entered after all the evidence had been considered. "The essentials of sound judicial character lie far deeper than superficial deportment." *Harrington* v. *Boston Elev. Ry.*, 229 Mass. 421, 433 (1918).

*Psychiatric evidence.* That portion of the psychiatrist's testimony which described and depended upon the diagnoses of the mother's mental condition appearing in various hospital records should not have been permitted. The mother's counsel sufficiently objected to such testimony on both hearsay and privilege grounds. An out-of-court diagnosis is inadmissible in the absence of an exception to the hearsay rule. *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 274 (1990). Liacos,

Massachusetts Evidence 112-113 (5th ed. 1981). General Laws c. 233, § 79G, does not supply such an exception absent a pretrial notice of intention to offer a report containing a physician's diagnosis. *Grant* v. *Lewis/Boyle, Inc., supra.* In any event, it is doubtful that the provision for the admission in evidence of an out-of-court diagnosis of a physician pursuant to G. L. c. 233, § 79G, would apply to a psychiatric diagnosis protected by G. L. c. 233, § 20B.[8]

The department argues that the opinion testimony of the psychiatrist was properly admitted since it was based upon admissible information contained in out-of-court reports of the mother's treatment. It is established that an expert may "base an opinion on facts or data not in evidence if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion." *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986). The mother does not contend that the information relied upon by the psychiatrist is not "of the sort that experts in that specialty reasonably rely on in forming their opinions." *Id.* at 532. The issue raised, therefore, is whether that information is independently admissible.

Although the hospital records upon which the psychiatrist based her testimony are not before us, even as identification exhibits,[9] one reasonably may infer from that testimony that they include "communications" of the mother to a "psychotherapist" as those terms are defined by G. L. c. 233, § 20B, and, therefore, are generally subject to the privilege established by that statute. That fact alone may not render such records wholly inadmissible. *Commonwealth* v. *Kobrin*, 395 Mass. 284, 294-295 (1985). *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279,

---

[8] There is no claim or indication in the record that the exception provisions of G. L. c. 233, § 20B(*e*), were invoked.

[9] At the close of the evidence, counsel for the department attempted to introduce "all of the records of the mother's psychiatric treatment" as an exhibit. When that effort was resisted by both counsel for the mother and the judge, counsel for the department attempted to have the records marked for identification. Dissuaded from doing so by the judge, she rested her case. The records are, therefore, not before us.

287 (1987).[10] The exercise of the privilege established by G. L. c. 233, § 20B, does not preclude admission of such parts of a psychiatric record as are "conclusions based on objective indicia rather than on communications from the mother." *Adoption of Abigail*, 23 Mass. App. Ct. 191, 198-199 (1986). The extent to which the psychiatrist based her testimony on objective facts or data as distinguished from communications by the mother to a treating psychotherapist is not clear. To the extent that the psychiatrist's opinions may have been grounded on such a mixed foundation, the recommended approach would be for the mother's counsel to request a voir dire to determine the basis of the expert opinion. See *Department of Youth Servs.* v. *A Juvenile, supra* at 532. Such assertiveness is perhaps more than should be expected from an attorney, in a nonjury trial, confronted with a judge posing questions to a witness whose presence had been commanded by the judge. In these circumstances, it behooved the judge to make certain that the witness's testimony was based upon admissible information. His failure to do so is rendered harmless, however, by the absence of substantial prejudice to the mother. *Adoption of Christine*, 405 Mass. 602, 606 (1989).

*Absence of substantial prejudice.* The mother has not shown that the erroneous admission of the psychiatrist's testimony has "injuriously affected" her "substantial rights". See G. L. c. 231, §§ 119 and 132. The evidence introduced by the department, independent of the testimony of the psychiatrist, was uncontroverted and unchallenged.[11] The judge's subsidiary findings are specific and detailed and demonstrate close attention to that evidence and sensitivity to the gravity

---

[10]A strict reading of the latter decision supports the proposition that the admissibility of record information that does not constitute "communications" may be limited, if privilege is claimed, to "nonpsychiatric" hospital admissions.

[11]Neither the mother's counsel nor the child's counsel offered any evidence. The mother was permitted to make an unsworn statement to the court.

of the issues presented.[12] *Custody of Two Minors*, 396 Mass. 610, 619 (1986). To the extent that the judge's unfitness conclusion was based on the mother's mental illness, the necessary nexus was supplied by evidence introduced through the guardian ad litem and the social workers. *Custody of a Minor (No. 2)*, 378 Mass. 712, 722 (1979). See also *Care & Protection of Stephen*, 401 Mass. 144, 152 (1987). Those findings which are grounded on nonprivileged evidence overwhelmingly support the judge's conclusions. Compare *Adoption of Christine, supra; Adoption of Adam*, 23 Mass. App. Ct. 922, 925 (1986). They amply fulfil the requirement that evidence supporting the termination of parental rights be clear and convincing. *Santosky* v. *Kramer*, 455 U.S. 745, 769-770 (1982). Compare *Custody of Two Minors, supra.*

*Decree affirmed.*

---

[12]The mother challenges the evidentiary foundation of certain findings relating to her inattentiveness to Seth and her inability to feed and care for him. Our review of the record indicates that these findings (together with those that are unchallenged) are supported by proper evidence and are not clearly erroneous. They, therefore, should not be disturbed. *Petition of New Bedford Child & Family Servs. to Dispense with Consent to Adoption*, 385 Mass. 482, 489 (1982). Her further challenge of the currency of several findings relating to the issue of unfitness ignores well established principles relating to the prognostic value of past conduct. *Custody of Michel*, 28 Mass. App. Ct. 260, 269-270 (1990), and cases cited.