The father appeals from decrees issued by a judge of the Juvenile Court finding him unfit to parent his daughters, Sadie and Jane,[3] and terminating his parental rights.[4] He contends that he was deprived of a fair trial, that there was insufficient evidence to support terminating his parental rights, and that the judge erred in approving the adoption plan of the Department of Children and Families (department) rather than his request for reunification. We affirm.
1. Fair trial. The father first argues that he did not receive a fair trial due to certain errors by the judge. Specifically, he claims that the judge (1) abused his discretion in denying the father's request to continue the trial to allow one of the father's witnesses to testify; (2) predetermined the outcome of the trial, as evidenced by questions asked of the maternal grandmother; and (3) erred in declining to allow the children to testify at trial.
First, the judge did not abuse his discretion in declining to continue the trial. "[W]hether to continue any judicial proceeding is a matter entrusted to the sound discretion of the judge, and the judge's decision will be upheld absent an abuse of that discretion." Adoption of Gillian, 63 Mass. App. Ct. 398, 409-410 (2005). The start of trial was continued to allow the father to gather his witnesses; during trial the judge scheduled an additional (seventh) day to permit the father to reissue summonses for two of his witnesses who did not appear.[5] According to the father's proffer, Xavier Cardona, a facilitator at the Nurturing Father's program (program) "would be able to answer more questions" that Ryan Saucier (another program facilitator) could not answer about the father's 2015 attendance and active involvement in the program; the parties ultimately stipulated to the father's attendance, participation, and interest in continuing in the program, and those facts were included in the judge's findings. The judge indicated that he had a "significant" amount of evidence with respect to the program.
Saucier provided testimony as to the father's involvement in the program. He testified that during group discussions the father continuously focused on his extreme frustration with the maternal grandmother and the department and that he was working each week, without much progress, on managing or expressing the root cause of these emotions, which was the purpose of the program. According to Saucier, after attending ten (out of thirteen) sessions of the program, the father had incorporated "very little" of the techniques learned regarding managing his "really high" frustrations; although the father was receptive to the goals of the program, his level of frustration with the maternal grandmother and the department interfered with his progress. In fact, the father reported to Saucier that he did not feel as though he was achieving any progress. After completing the program, the father attended a follow-up support group offered to graduates of the program. Although the men were allowed to attend the weekly support group as desired, the father eventually was asked to stop attending. In light of this evidence, the judge could have reasonably determined that it was unnecessary to continue the trial for another day for the sole purpose of eliciting Cardona's testimony, which likely would have been similar to evidence already presented.
Second, the judge did not predetermine the outcome of the trial before it concluded. "A judge has the right and, in some circumstances, the duty to participate in the examination of a witness." Adoption of Seth, 29 Mass. App. Ct. 343, 351 (1990). He is " 'not a mere functionary to preserve order and lend ceremonial dignity to the proceedings' but rather 'the directing and controlling mind at the trial.' " Id. at 350, quoting Whitney v. Wellesley & Boston St. Ry., 197 Mass. 495, 502 (1908).
As the fact finder, the judge was permitted here to pursue, in an impartial manner, greater clarity in the testimony by questioning the maternal grandmother. The focus of the questions followed up on answers previously given by the grandmother during her direct examination by the department, and her cross-examination by the children's counsel, in an effort to ascertain whether she had any health impediments that would prevent her from caring for the children, and the logistics relating to potential posttermination visits between the children and the father. In addition, the judge's questions did not deny the father the "opportunity to rebut adverse allegations concerning his ... child rearing capabilities." Adoption of Rory, 80 Mass. App. Ct. 454, 458 (2011), quoting Brantley v. Hampden Div. of the Probate & Family Court Dept., 457 Mass 172, 185 (2010). There is no indication in this record that the judge prematurely assessed the evidence in arriving at his decision.
Finally, the judge did not abuse his discretion in denying the father's renewed request to have the children testify.[6] See G. L. c. 119, § 21A ; Adoption of Peggy, 436 Mass. 690, 703 n.15, cert. denied sub nom. S.T. v. Massachusetts Dept. of Social Servs., 537 U.S. 1020 (2002) ("the judge was not required to hear testimony of the child[ren]" even after determining their competence and willingness to testify). At trial, the father proffered that he sought to have the children cross-examined on issues of their preference in living with the maternal grandmother; he felt that the children were being "swayed" by other individuals against him, and that by allowing them to testify, he and the judge could hear directly from the children what they wanted. However, as the judge found, no evidence had been admitted relating to any statements made by the children as to their preferred living arrangements, and the judge "declined to allow the father to conduct any type of examination of the children on an area that was not in evidence, determining that it would not be relevant nor probative and would be detrimental to the children's best interest."[7]
The children's "rights to be heard on issues affecting their interest should be respected, and ... their positions, based on mature expression, are entitled to weight in custody proceedings (although not determinative)." Care & Protection of Georgette, 439 Mass. 28, 36 (2003). However, the judge acted permissibly in denying the father's request, after determining that the children's testimony was neither probative nor relevant.
We conclude that the father received a full and fair trial, and his due process rights were not violated, as he was afforded the opportunity to be heard at a meaningful time and in a meaningful manner. See Guardianship of V.V., 470 Mass. 590, 592 (2015).
2. Sufficiency of the evidence. The father next argues that the finding of his unfitness and the subsequent termination of his parental rights lacked the support of clear and convincing evidence. His argument lacks merit.
"In care and protection cases, the judge's subsidiary findings must be proved by a preponderance of the evidence and will only be disturbed if clearly erroneous." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). "Taken together, these findings must then prove clearly and convincingly that the [father is] currently unfit to provide for the welfare and best interests of [the children]." Id., quoting Adoption of Quentin, 424 Mass. 882, 886 (1997). "In determining whether the best interests of the children will be served by issuing a decree dispensing with the need for consent, a 'court shall consider the ability, capacity, fitness and readiness of the [father] ... and shall also consider the plan proposed by the department ....' " Adoption of Nancy, 443 Mass. 512, 515 (2005), quoting G. L. c. 210, § 3 (c ). The judge may properly take into account "prognostic evidence derived from an ongoing pattern of parental neglect or misconduct." Custody of a Minor (No. 1), 377 Mass. 876, 883 (1979).
The judge's unchallenged subsidiary findings of fact are amply supported by the record. Because we discern no error in the judge's findings, they will remain undisturbed. Adoption of Nancy, 443 Mass. at 515. The record shows that at the time of the March 11, 2013, G. L. c. 119, § 51A, report (51A report) alleging neglect of the children by the father, the department already had a history of involvement with this family.[8] The 51A report stemmed from an allegation of neglect by the father in failing to adequately supervise the children, the hygiene of the children (especially the ongoing lice infestation), and the condition of the home; the department did not at that time remove the children from the father's care, but the case remained open for services. In August, 2013, the father requested the termination of all department services for him and the children despite the many ongoing issues that led to the department's involvement. The department attempted to continue working with the father rather than removing the children in an attempt to avoid a disruption to the family unit, especially because of the effect the mother's death had on the children.
In April, 2014, the family was evicted from public housing; rather than agreeing to place the children with the maternal grandmother, who was "willing, ready and able to take them," the father brought the children to live in a motel (which he could not afford), and then later separated the children, scattering them among different friends' homes. Around this same time, the father stated to the court investigator that he needed the children to remain in his custody in order to collect the Social Security benefits ascribed to each child after their mother's death.[9] Finally in May, 2014, the father agreed to placement of the children with the maternal grandmother, although he initially suggested a nonkinship foster home; when the children came to the maternal grandmother's care, they were infested with head lice and required significant medical treatment to remediate the problem.
Throughout the pendency of the department's petition, the father has failed to find steady and continuous employment, which has impacted his ability to locate and maintain suitable housing and other necessaries for the children; he has made no attempt to update his self-proclaimed computer skills to make himself more employable, nor has he taken steps to improve his financial situation to provide a secure environment for the children.[10] Between the time the children were removed from his care and the time of trial, the father had been homeless or living in his car, had lived in a shelter for five to six months, and for the eight months preceding the trial had lived with a friend which, he acknowledged, was not a suitable housing situation for the children. He has continued to refuse department services. Nor has he learned techniques for budgeting his income, or addressed with the social worker his inability to obtain appropriate housing. He was generally noncompliant with his service plan, refusing to provide necessary financial information (citing an invasion of privacy), refusing the social worker and investigator access to his home, refusing to consistently participate in individual therapy, and refusing to take responsibility for the conditions that brought the children into department care, all required tasks of his service plan.
Furthermore, the father's attitude toward the department was volatile, and he often ranted and yelled at the social worker; he was cooperative on occasions when he wanted something from the department. He was generally resistant to department intervention, maintaining there was no need for services; the father repeatedly indicated that the department should be a source of financial support for his family rather than requiring them to participate in services that they did not need. His relationship with the maternal grandmother also remained contentious. While the children were in the grandmother's custody, the father filed 51A reports with the department against her, alleging that the children were being "mentally abused"; he also requested that the children be removed from the maternal grandmother's home despite their progress in that setting.
The evidence also shows that when the children were in his sole care the father repeatedly neglected their medical and dental needs, and as noted, they had serious, ongoing problems with head lice. The father failed to properly supervise the children, leaving them home alone in the care of their older sister for many hours and sometimes overnight. He refused to allow the department into his home, but when he finally did, the ongoing social worker, Sarah Griffith, found the home dirty, with sticky floors and dirty walls, and little food available for the children. In addition, the father signed up the children for individual therapy but then never took them to the appointments. He refused in-home therapy and grief counselling for the children, citing privacy issues and stating that "there were too many eyes on [him] and the children." The father's ongoing failure to recognize the necessity of services and his unwillingness to participate in them supports the finding that additional time will not assist the father in ameliorating his situation.
As previously noted, the father did actively participate in, and complete, the Nurturing Father's program. However, as Saucier testified, the father did so without making much progress in achieving the goals of the program and had incorporated in his life "very little" of the techniques learned. Griffith also testified that it did not appear that the father was applying the knowledge gained from the program into his day-to-day parenting. As the judge acknowledged, the father had been attending individual therapy for the six months preceding trial. In addition, the father had consistently attended scheduled monthly supervised visits with the children, which generally went well, and the children seemed to enjoy the visits.[11] However, he often arrived late to the visit, or ended it early, and declined regular telephone communications with the children because he objected to the monitoring of their conversations. Also, the children often manifested signs of stress after visits, and reacted negatively to "hollow" promises made by the father during visits.
After reviewing the record, we conclude that there was sufficient evidence to support the judge's determination that the father was currently unfit to parent the children and that the condition was not temporary. The judge's detailed findings of fact and conclusions of law, which the father does not specifically challenge, demonstrated "that close attention has been given the evidence and that the necessity of removing the child[ren] from [the father] has been persuasively shown." Adoption of Martha, 407 Mass. 319, 327 (1990), quoting Custody of a Minor (No. 1), 377 Mass. at 886. In addition, the judge properly applied the relevant statutory criteria of G. L. c. 210, § 3 (c ), in reaching his decision to terminate the father's parental rights.[12]
3. Adoption plan. The father finally argues that the judge erred in approving the department's plan for adoption of the children by the maternal grandmother and her husband, rather than the father's plan for reunification. This argument also fails.
The judge did not abuse his discretion in approving the department's adoption plan. "Pursuant to G. L. c. 210, § 3(c ), in addition to considering the issue of parental unfitness, the judge must consider the adoption plan proposed by [the department] before terminating parental rights." Adoption of Dora, 52 Mass. App. Ct. 472, 474 (2001). See G. L. c. 119, § 26 (b ) (4). In determining the adoption plan, the trial judge is in the best position to consider and choose among the factual elements presented, focusing on the children's best interests, and "we do not disturb his findings unless they are clearly erroneous." Adoption of Irene, 54 Mass. App. Ct. 613, 617 (2002). "[W]here alternative plans for adoption are presented, there must be an 'even-handed assessment of all the facts,' ... and the judge must give appropriate weight to 'the personal, educational, psychological, and other support available to each prospective parent to address [the children's] needs.' " Id., quoting Adoption of Hugo, 428 Mass. 219, 226 n.8, 227 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999). "In so doing, the judge is not to afford any particular weight to either the parents' or [the department's] plan." Adoption of Dora, supra at 475.
Here, the department and the father proposed competing plans. The department's plan called for adoption by the maternal grandmother and her husband, as the children had been in that home, at the time of trial, for three years (and for eight months in 2007 and 2008); they were settled, doing well and making academic progress in school, had made new friends, and were up to date on medical and dental care. The children's older sister, with whom they had a close relationship, also lived in the home. The father sought reunification, but admitted that even after three years he was not in a position to immediately take the children and would need more time to find an appropriate living situation. The instability of the father's living arrangements had been an ongoing issue from the time of the children's removal in 2014, which he had failed to rectify. "[T]he judge is not required to grant the father an indefinite opportunity to reform." Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012). It is clear that the judge evenhandedly assessed the suitability of both proposed plans. As a result, the judge found by clear and convincing evidence that the plan proposed by the department was in their best interests. See Adoption of Dora, 52 Mass. App. Ct. at 475. We see no error.
Decrees affirmed.

Sadie's and Jane's older sister turned eighteen during the pendency of the case and was removed from the petition. She is not part of this appeal, and our references to "the children" are to Sadie and Jane.

The children's mother died in November, 2010.

One witness, Rosemarie Simoes, later testified telephonically as to her supervision of visits between the father and the children over a ten-month period. The other witness, Xavier Cardona, never testified, but not for lack of trying; he appeared earlier at the trial but was not called to testify on that day. On day six of the trial the father's counsel called Cardona at the moment that he was boarding an airplane, so he was unable to testify by telephone; on the seventh day of trial he was unreachable by telephone after several attempts by the father's counsel.

At the outset of trial the father requested that the children be allowed to testify, but he then later withdrew his request. On the fifth day of trial the father renewed his request.

The judge explained to the father that the children's testimony could actually hurt his case-in-chief.

The involvement of the department dated back to 2003, when reports of neglect of Sadie's and Jane's older sister were filed against both parents based on homelessness, poor personal hygiene (specifically the persistent infestation of head lice), excessive school absences and tardiness, and the failure of the parents to properly supervise her. Again in 2007, concerns of neglect stemmed from the parents' failure to address the children's head lice, the parents' resistance to department-recommended services, and a criminal complaint filed against the father in Maryland relating to a sexual offense against his stepsister. Shortly after the 2007 report, the children were removed from the parents' care and placed with the maternal grandmother; one of the children required extensive dental treatment, which the grandmother arranged. After the parents utilized department services, the children were returned to them in August, 2008.

Despite the children's emotional suffering from the loss of their mother, the father failed to engage them in grief counselling as suggested by the department.

Throughout his adult life, the father has not had steady employment; he claims that after receiving his GED, he took a six-month course at a computer learning center and worked in another State in the computer industry. He has not been employed in that field for many years, instead choosing to support himself and the children by working temporary jobs, or by selling DVDs and other items at yard sales and on street corners. The father has consistently refused to provide the department with pay stubs or other financial information as required by his service plan.

The father presented with hygiene issues at some of the visits, and there were concerns that he was transmitting head lice to the children.

Specifically, the judge found subsections (ii), (iii), (iv), (vi), (vii), (viii), and (xii) applicable to the father. See G. L. c. 210, § 3 (c ).