JOHN TARPEY[1] *vs.* CRESCENT RIDGE DAIRY, INC., & others.[2]

No. 97-P-1194.

Norfolk. April 6, 1999. - July 22, 1999.

Present: KASS, DREBEN, & GILLERMAN, JJ.

*Evidence,* Expert opinion, Scientific test. *Witness,* Expert. *Practice, Civil,*
   Verdict, Failure to raise issue, Special questions to jury, Attorney's fees,
   Costs. *Consumer Protection Act,* Demand letter, Damages, Attorney's fees.

At the trial of a negligence action, the judge did not err in denying the
   plaintiff's motion to exclude expert testimony offered by the defendant
   concerning the results of tests using certain antibodies, where the record of
   the extensive voir dire of the witness and of the trial supported the judge's
   conclusion that such testimony was admissible without application of the
   analysis under *Frye* v. *United States,* 293 Fed. 1013 (Ct. App. D.C. 1923),
   or a determination of validity or reliability under *Commonwealth* v. *Lani-
   gan,* 419 Mass. 15 (1994). [386-389]
A claim of inconsistency in a jury verdict in a civil action could not be made
   for the first time on appeal and, in any event, was without merit. [389-390]
Any inconsistency in a civil verdict with respect to punitive damages did not
   prejudice the plaintiff, where the damage award was vacated because there
   was no finding that the defendant's conduct had caused the plaintiff's
   death. [390-391]
A G. L. c. 93A demand letter served over a year after a civil complaint was
   filed was adequate, and the plaintiff's motion to file an amended complaint
   to add c. 93A claims was properly allowed two months later. [391-392]
In a civil action alleging negligence, breach of warranties of fitness and
   merchantability, and violation of G. L. c. 93A, there was no error in the
   amount of the judge's assessment of nonmultiple damages on the c. 93A
   claim. [392]
The plaintiff in a civil action was not entitled to an award of attorney's fees
   and costs for the period before his G. L. c. 93A claim was added to the
   case, nor, in accordance with G. L. c. 93A, § 9(4), for the period following
   the plaintiff's rejection of the defendants' reasonable offer of settlement,
   tendered within thirty days of the plaintiff's demand letter. [392]
In a civil action, there was no error or abuse of discretion in the judge's
   denial of the defendants' motion under Mass.R.Civ.P. 67 to deposit monies

---

[1]Executor under the will of Catherine Tarpey.

[2]Freeman Industries, Inc., W.T. Beck Specialty Company, Inc., Robert Par-
rish, and Stanley Parrish.

representing damages awarded the plaintiff into court to avoid the accrual of statutory interest, where the defendants continued to contest their liability in appellate proceedings. [393]


CIVIL ACTION commenced in the Superior Court Department on July 9, 1991.

The case was tried before *Robert A. Mulligan*, J.

*Marshall A. Karol (Robert I. Kalis* with him) for Crescent Ridge Dairy, Inc., & another.

*Anthony M. Feeherry* for the plaintiff.

GILLERMAN, J. Catherine A. Tarpey, a vigorous woman until her last illness, died in November, 1990, at age 72. When hospitalized, Tarpey was diagnosed with hypercalcemia[3] and elevated levels of vitamin D in her blood stream. She was placed on prednisone therapy which allegedly compromised her immune system and led ultimately to her death from pneumonia.

Her executor, the plaintiff, brought suit in July, 1991, against Crescent Ridge Dairy, Inc. (Crescent Ridge), which produced and distributed dairy products including milk, and various other parties.[4] Crescent Ridge fortified its milk with vitamin D concentrate, but during the relevant period (1990) it did so with up to five hundred times the amount of vitamin D allowed by law. See 105 Code Mass. Regs. § 541.002 (1986). The plaintiff claimed that Tarpey usually drank two or three full glasses of Crescent Ridge milk daily, and her ingestion of large amounts

---

[3]Hypercalcemia is an "abnormally high concentration of calcium compounds in the circulating blood; commonly used to indicate an elevated concentration of calcium ions in the blood." Stedman's Medical Dictionary (26th ed. 1995).

[4]The claims against Crescent Ridge included counts for negligence, breach of implied warranty of merchantability, and breach of implied warranty of fitness. Subsequent amendments added claims of negligence and breach of implied warranty of merchantability against W.T. Beck, the manufacturer of vitamin D concentrate, and Freeman Industries, Inc., the distributor; a claim for negligence against Robert Parrish, president of Crescent Ridge; c. 93A claims against Crescent Ridge and Robert Parrish; and a claim for fraudulent conveyance against Robert Parrish and Stanley Parrish. The plaintiff has not appealed from that portion of the final judgment finding W.T. Beck and Freeman Industries, Inc., not liable for Tarpey's injuries and death. The claims of fraudulent conveyance against Robert Parrish and Stanley Parrish were severed and stayed pending the outcome of this appeal. Accordingly, the plaintiff's Mass.R. Civ.P. 54(b), 365 Mass. 821 (1974), motion was allowed, permitting this appeal to proceed.

of vitamin D in the Crescent Ridge milk was the cause of her hypercalcemia which, as we have said, allegedly led to her death. The expert for Crescent Ridge, on the other hand, testified that Tarpey's death was related to factors other than her consumption of Crescent Ridge milk.

In response to special questions, the jury found that Crescent Ridge had breached the warranties of fitness and merchantability, that it was negligent in its addition of vitamin D to its milk, but not grossly negligent, that Robert Parrish, the president of Crescent Ridge, individually was negligent, and that such negligence amounted to gross negligence, and that Crescent Ridge and Robert Parrish had caused Tarpey's injuries but *not* her death. The jury awarded damages in the amount of $125,000 for Tarpey's injuries, and punitive damages in the amount of $150,000 against Robert Parrish, which was later vacated because of the absence of a finding that Parrish's conduct caused Tarpey's death.

On the c. 93A claims against Crescent Ridge and Robert Parrish (defendants), see note 4, *supra*, the judge assessed damages caused by the defendants' breaches of warranties of merchantability and fitness in the amount of $250,000 which, the judge particularly stated, "includes and is not in addition to the $125,000 awarded by the jury." Still later, the judge entered an order which stated that "[t]he damages which I assessed . . . were *not* multiple damages. . . . The interest shall run on the sum of $250,000." The plaintiff also was awarded his costs, attorney's fees and their costs, expert witness fees, and interest on $250,000 from the date of the commencement of the action.

Timely notices of appeal were filed by Crescent Ridge and Robert Parrish (as appellants regarding various issues arising under c. 93A and other procedural matters), and by the plaintiff (as cross-appellant regarding the admission in evidence, over his objections, of the opinion testimony of the defendants' expert, Andrew Rosenberg, M.D.,[5] and regarding allegedly inconsistent verdicts), all as more particularly described below.

We discuss first the plaintiff's claims on appeal.

1. *The admission of Rosenberg's opinion testimony.* First, the qualifications of Rosenberg. Rosenberg is a board certified

---

[5]The plaintiff also claims an appeal from the denial of a motion for a new trial. No such motion appears in the plaintiff's record appendix, and we do not consider that claim. It appears, in any event, to refer to the plaintiff's objections to the opinion testimony of Dr. Rosenberg, which we discuss in detail.

pathologist employed by the pathology department of the Massachusetts General Hospital, an associate professor of pathology at Harvard Medical School, and the author of approximately one hundred articles in scientific journals. His specialty is anatomy pathology, which is the study of disease using human tissue. His particular field of interest is in the surgical pathology of diseases of the skeleton — a difficult field with few physicians having the necessary expertise. Rosenberg's credentials are not in controversy.

We summarize Rosenberg's testimony. There are various causes of hypercalcemia, the most common being cancer. Cancer causes hypercalcemia by destroying the bones which contain calcium which is then released into the bloodstream. The cancer produces a parathyroid hormone related protein known as PTHrP. PTHrP causes the skeleton to release calcium in the blood, and cancer cells which secrete PTHrP are the most common cause of hypercalcemia. The size of the tumor does not determine the amount of PTHrP produced.

Numerous tests had been conducted to determine whether Tarpey had cancer, but no cancerous growth was identified. Rosenberg was given the court's permission to review the slides of Tarpey's lung tissue which had been obtained in the autopsy and thereafter properly preserved. Rosenberg's examination of the slides revealed a type of cancer in Tarpey's lung tissue. Rosenberg gave this new information to Dr. Godleski, who had previously reviewed Tarpey's autopsy at the Brigham and Women's Hospital where Tarpey was last treated. Godleski prepared twelve or fourteen slides of Tarpey's tumor and submitted them to Dr. Ronald A. DeLellis, a pathologist at the Tufts New England Medical Center, to test for the presence of PTHrP using polyclonal antibodies. This type of study, known as immunohistochemistry, is used by pathologists to determine whether a particular substance is present in tissue. It is not disputed that the use of antibodies to identify PTHrP molecules is a recognized and accepted technique within the field of immunohistochemistry.[6]

After completing his PTHrP antibody tests, DeLellis's test

---

[6]In his materials presented to this court, the plaintiff has described the PTHrP antibodies test as follows: "In brief, the PTHrP antibodies test works by taking an antibody for PTHrP and placing it on the tumor tissue slide. The antibodies are then 'flushed off the slide.' The PTHrP antibody, if performing

slides were delivered to Rosenberg. Rosenberg is an expert in immunohistochemistry. He has worked with immunohistochemistry tests "as much as probably anybody in the country." Rosenberg examined the slides and concluded that the immunohistochemistry test performed by DeLellis to identify the PTHrP molecule, using polyclonal antibodies, "did not work . . . everything, the tumor, and the lung, and everything else on the slide stained positively. And that's called non-specific staining . . . tissues on the slide that should not contain PTHrP were staining indicating there was false staining . . . therefore [it was] impossible to come to a conclusion regarding the results based on that slide."

Of the slides sent to Rosenberg by DeLellis, six were unstained; they had not been subject to testing by DeLellis. Once Rosenberg was assured that these slides of Tarpey's lung tissue showed a tumor, he sent the slides to Dr. Leonard Deftos in California for testing.

At this point in Dr. Rosenberg's testimony, and prior to his expressing any opinion, the judge called for a voir dire.[7] The following is a summary of that testimony.

Rosenberg had reviewed the "medical literature from the different laboratories in this country that have antibodies to PTHrP, [and found that] Dr. Deftos's lab used the most stringent criteria in his testing, and in his development of the antibodies. . . . [Rosenberg] wanted the best lab to work with the tissue and as far as [he] was able to determine [Deftos's laboratory] was the

---

properly, will 'stick' to any PTHrP present on the slide and to nothing else. The presence of PTHrP is determined by staining or dyeing the slide to identify the PTHrP antibody." More simply still: the slide, with tissue, is stained to identify the PTHrP antibody, and if not flushed off, what the PTHrP antibody sticks to is the PTHrP molecule.

[7]The plaintiff had previously filed a detailed motion in limine to exclude any opinion testimony by Rosenberg. In the motion, he argued that Rosenberg's testimony about the results of Deftos's test should be excluded because the test was not "generally accepted" in the relevant scientific community and was not reliable, as evidenced by the fact that Deftos's test, and the antibodies it employed, were not available commercially and were used only in his laboratory; Rosenberg knew of no one else who used monoclonal, as opposed to polyclonal, antibodies in such a test; DeLellis's test had been negative for PTHrP; only one of the two Deftos tests performed was positive, and Deftos himself said that, although he believed the result was positive, "the poor quality of the tissue makes interpretation difficult"; and the Deftos test occasionally stained non-tumor cells positive for PTHrP. Lastly, the motion argued that Rosenberg was not qualified to testify as to the reliability or general acceptance of the Deftos test.

best lab to do it." Deftos's laboratory generated monoclonal antibodies which "recognized" the PTHrP molecule and nothing else. However, these particular antibodies are not available at the Massachusetts General Hospital, and Rosenberg had decided to use the Deftos-developed antibodies and no other.

The slides went forward to Deftos. He performed the tests required to determine whether the tumor cells in Tarpey's tumor contained PTHrP, following which the stained slides were returned to Rosenberg. Rosenberg examined the test results — the stained slides — processed by Deftos's laboratory, and he determined that Tarpey's tumor cells were producing PTHrP. On cross-examination within the voir dire, the defendant established that the antibodies produced by Deftos were used only by his laboratory, and that Rosenberg had never before used the antibody developed by Deftos. The plaintiff did not make any inquiry regarding the difference, if any, between the *polyclonal* antibody used by DeLellis and the *monoclonal* antibody used by Deftos,[8] nor regarding any of the other bases for objection raised in his motion in limine. Rosenberg's voir dire terminated at this point.

Based on Rosenberg's voir dire testimony, the plaintiff argued that the conditions for admissibility imposed by *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531-532 (1986), had not been satisfied. That case holds that where an expert is basing his opinion on facts or data not admitted in evidence, those facts, or data, must be "independently admissible," and they must be "of the sort that experts in that specialty reasonably rely on in forming their opinions." *Ibid.* Here, the defendant was offering the opinion testimony of Rosenberg based on the Deftos test results without producing Deftos or any of his staff involved in the test procedures.

The judge concluded that the requirements of *A Juvenile* were satisfied, and Rosenberg would be permitted to express his opinion. The plaintiff's motion in limine was denied. Rosenberg thereupon testified in detail and at length, giving his opinion that the PTHrP secreted by Tarpey's lung tumor — not the vitamin D — was the likely cause of her hypercalcemia,[9] and

---

[8]In immunohistochemistry, monoclonal refers to a protein from a single clone of cells; polyclonal refers to proteins from more than a single clone of cells. Stedman's Medical Dictionary (26th ed. 1995).

[9]Rosenberg examined slides of Tarpey's skeleton which, in Rosenberg's

that the actual causes of Tarpey's death were unrelated either to her high levels of vitamin D or to the prednisone therapy.

On cross-examination, the plaintiff established that the antibody used by Deftos in his testing procedures was monoclonal, while the antibody used by DeLellis was polyclonal, and that Rosenberg did not know whether any other laboratory used monoclonal antibodies to test for PTHrP. On the basis of Rosenberg's testimony as just summarized, the plaintiff now argues that the Deftos test is neither "generally accepted" in the scientific community under the *Frye* test (applicable at the time of trial, see *Commonwealth* v. *Fatalo*, 346 Mass. 266 [1963], adopting *Frye* v. *United States*, 293 Fed. 1013 [Ct. App. D.C. 1923]), nor valid or reliable under *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994). *Lanigan* was decided after the trial of this case; the decision is discussed below.

The plaintiff acknowledges in his brief that the use of *polyclonal* antibodies to test for the presence of PTHrP (as performed by DeLellis) was generally accepted in the scientific community, but he argues there was no evidence that the use of *monoclonal* antibodies to test for the presence of PTHrP (as performed by Deftos) was generally accepted in the scientific community. He further reasserts the other arguments in his motion in limine (see note 7, *supra*). Thus, the argument continues, the judge made a critical error in admitting Rosenberg's opinions — an error that so materially affected the outcome of the case that he is entitled to a new trial.

We disagree. We find that this case falls within "those cases which accept expert testimony based on personal observations, clinical experience, or generally accepted scientific techniques without application of the possibly more rigorous analysis set out in [*Frye/Lanigan*] . . . ." *Vassallo* v. *Baxter Healthcare Corp.*, 428 Mass. 1, 15 & n.15 (1998) (collecting cases).

The argument that the use of monoclonal antibodies for immunohistochemistry testing is outside the circle of general acceptance lacks an evidentiary foundation. In spite of ample opportunity to cross-examine Rosenberg, both during his voir dire and later before the jury, regarding the importance of any differ-

---

opinion, showed the presence of osteoclasts (bone-destroying cells) as well as the absence of bone-formation cells. This occurs, Rosenberg opined, when PTHrP is secreted into the blood stream. Based upon the presence of osteoclasts, Rosenberg concluded that PTHrP, not vitamin D, caused Tarpey's hypercalcemia; vitamin D had not been shown to create osteoclasts in humans.

ence between polyclonal and monoclonal antibodies, the plaintiff made no such inquiry. The plaintiff called two expert rebuttal witnesses, Michael Horlick, M.D., and Leonard Gottlieb, M.D. Again, no inquiry was made of either expert regarding any important difference between monoclonal and polyclonal antibodies in immunohistochemistry testing for PTHrP. There is simply nothing in the record before us which suggests that Deftos did anything more than improve the immunohistochemistry technique of testing for PTHrP, nor is there anything in the record which suggests that this modification in technique was based on a new scientific theory calling for evidence of general acceptability.

The plaintiff cannot rely only on unsupported assertions in his motion in limine and his brief to propose that the use of monoclonal antibodies to test for PTHrP is a new "scientific theory" requiring independent evidence of general acceptability. When, as in this case, the plaintiff has acknowledged the general acceptance of antibodies as acceptable vehicles for testing for PTHrP, it is incumbent upon the plaintiff to press the issue of whether the particular variation developed by Deftos is based on a new scientific theory requiring independent evidence of general acceptance. Cf. *Commonwealth* v. *Daye*, 411 Mass. 719, 741 (1992) (less favorable standard of review where defendants neither sought voir dire nor objected to expert's testimony on basis of *Frye* test).

Even assuming that Deftos's substitution of monoclonal for polyclonal antibodies was a new scientific theory, we nevertheless conclude that the evidence offered by the defendant was sufficient to satisfy the requirements of *A Juvenile*, the decision upon which the judge correctly relied. There the court held that an expert is permitted to base an opinion on facts or data not in evidence "if the facts or data are independently admissible and are a permissible basis for an expert to consider in formulating an opinion." 398 Mass. at 531. This rule, wrote the court, will eliminate the need for producing exhibits and witnesses "whose sole function is to construct a proper foundation for the expert's opinion." *Ibid.* At the time of trial, the leading Massachusetts case regarding the admissibility of a new "scientific theory" was *Commonwealth* v. *Fatalo*, 346 Mass. at 269 ("Judicial acceptance of a scientific theory or instrument can occur only when it follows a general acceptance by the community of scientists involved."). *Fatalo* relied on *Frye* v. *United States,*

293 Fed. 1013 (Ct. App. D.C. 1923), the leading Federal case, which involved the admissibility of the results of a polygraph test.[10]

Recent decisions have emphasized the underlying rationale of *Frye/Fatalo.* Two days after the jury announced its verdict in this case, the United States Supreme Court decided *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). The "basic reasoning" of the *Daubert* opinion has since been adopted by the Supreme Judicial Court "because it is consistent with our test of *demonstrated reliability*" (emphasis added). *Commonwealth* v. *Lanigan,* 419 Mass. at 26.[11] The court in *Lanigan* reviewed the Massachusetts decisions regarding the admissibility of expert testimony based on scientific knowledge. Those decisions have focused on the *Frye* test: "whether the community of scientists involved generally accepts the theory or process." *Id.* at 24, quoting from *Commonwealth* v. *Curnin,* 409 Mass. 218, 222 (1991). The court pointed out, however, that "*[t]he ultimate test . . . is the reliability of the theory or process underlying the expert's testimony*" (emphasis added). *Ibid.* Continuing its discussion of *Frye,* the court wrote, "Perhaps the relevant scientific community has not yet digested and approved the foundation of the theory or process, but the theory or process is *so logically reliable that evidence should be admitted even without its general acceptance by involved scientists*" (emphasis added). *Ibid.* Thus, the *Frye* test, seen retrospectively, could not, as of the time of the trial,

---

[10]"The *Frye* test has been subjected to substantial criticism. . . . The rule is inherently conservative and . . . may bar otherwise reliable probative evidence . . . ." Liacos, Massachusetts Evidence § 7.8, at 385 (6th ed. 1994). See Geiger, Rocklin, & Sowle, Should Massachusetts Apply *Daubert* to Screen Expert Testimony, 79 Mass. L. Rev. 94, 94 (1994) (suggesting that the "Massachusetts courts currently apply a double standard to the admissibility of expert testimony" — applying strictly the *Frye* test in some cases, and in other cases presuming the admissibility of such testimony. See also *Commonwealth* v. *Cifizzari,* 397 Mass. 560, 570 (1986) (in Massachusetts, "the history of the admission of medical experts' opinions undermine[s] the . . . assertion that 'general acceptance' is a prerequisite to the admissibility of those opinions").

[11]The Supreme Judicial Court has left open the question whether *Lanigan* applies retroactively. *Commonwealth* v. *Gordon,* 422 Mass. 816, 838 (1996). But see *Halley* v. *Birbiglia,* 390 Mass. 540, 544 (1983) ("In general, changes in the common law brought about by judicial decisions are given retroactive effect").

be taken as an inflexible rule of evidence even when applied to a new scientific theory.

As to the case at hand. The judge admitted Rosenberg's opinion testimony. Implicit in the judge's decision was his judgment, after considering the plaintiff's carefully prepared motion in limine, and after an extensive voir dire of Rosenberg's testimony, that the Deftos test results could provide the basis of Rosenberg's opinion. Rosenberg's engagement of the Deftos laboratory was undertaken only after a careful search through the literature, and assurances that the Deftos laboratory "used the most stringent criteria . . . [and] was the best lab" to do the required immunohistochemistry test. Moreover, the plaintiff does not seriously argue that Rosenberg was not qualified to render an opinion interpreting the results of the Deftos, or similar, tests. The heart of the defendant's case, as we have said, was Rosenberg's expert opinion testimony. The plaintiff had already put on his expert in support of his theory of the case. Rosenberg's expertise was unusual. There are not many people in the world, Rosenberg testified, who specialize "in the surgical pathology of diseases of the skeleton." He had worked in the field of immunohistochemistry "as much as probably anybody in the country." There was ample justification for the judge's finding that Rosenberg's opinions, based on the Deftos test results, were plainly reliable if not entirely persuasive, and his ruling permitting the admission of Rosenberg's opinion testimony was not error. See *Commonwealth* v. *Gordon*, 422 Mass. 816, 842 (1996).

2. *The allegedly inconsistent verdicts.* The plaintiff claims that the jury's conclusion that the defendants' negligence did not result in Tarpey's death is inconsistent with their conclusion that the defendants' negligence caused Tarpey's injuries.[12] More specifically, the argument is that, since the defendants were found liable for negligently causing Tarpey's injuries, that conclusion had to have been based upon her ingestion of Crescent Ridge milk with the grossly excessive vitamin D. Since there was *no* evidence, the argument runs, of any injury produced *solely* by vitamin D intoxication, the injuries Tarpey suffered could only have been caused by her hypercalcemia (the alleged product of the vitamin D intoxication) which, according to the plaintiff, was the condition that led to her death. Thus the

---

[12]The judge accepted the jury's answers to all special questions except the jury's award of damages.

events of Tarpey's injury and death were intertwined and could not be separated, the plaintiff argues.

This claim of inconsistent verdicts, made only on appeal (according to the transcript of the trial before us), comes too late. *Uloth* v. *City Tank Corp.*, 376 Mass. 874, 884 (1978) (having failed to present a motion raising the issue of inconsistency in the verdict before the dismissal of the jury, defendants may not argue inconsistency on appeal). *Adams* v. *United States Steel Corp.*, 24 Mass. App. Ct. 102, 104 (1987) (late claim of inconsistency may not be raised in a motion for a new trial). See *Vassallo* v. *Baxter Healthcare Corp.*, 428 Mass. at 11 ("in civil cases . . . issues not . . . raised in the trial court will not be considered on appeal"). In any event the argument has no merit. The jury and the judge may well have inferred that Tarpey's vitamin D intoxication alone caused her pain and suffering, justifying the award of compensatory damages.

The plaintiff also claimed below, as he does in this court, that there was an inconsistent verdict regarding punitive damages. The jury first found that Parrish was grossly negligent (question 11), but then found that Parrish's negligence did not cause the decedent's death (question 12). The trouble arises a little further on. Without objection from the plaintiff, the verdict slip for question 15 (regarding the amount of punitive damages) instructed: "If you found gross negligence [was] committed by Crescent Ridge Dairy or Robert Parrish or Freeman Industries, answer question 15 only as to that person or entity which you found committed gross negligence." This statement omitted the key instruction, which the judge had earlier clearly given to the jury, that punitive damages were available only if the defendant's gross negligence was the cause of the decedent's death.[13] The result, not surprisingly, was the jury's punitive damage award of $150,000 against Robert Parrish because they had found his conduct to be grossly negligent. Thus the trouble was not with the answer to question 15, but rather with the verdict slip for that question, which erroneously allowed the jury to award

---

[13]The judge instructed the jury that "gross negligence applies only to the wrongful death claim here. If you determine that a decedent's death was as a result of a defendant's gross negligence, then the statute, the law allows you to award punitive damages. . . . Punitive damages are to be awarded to punish the defendant and to prevent or deter future wrongdoing." See G. L. c. 229, § 2 (punitive damages in an amount not less that $5,000 available upon proof that decedent's death caused by defendant's malicious or reckless act, or gross negligence).

punitive damages for gross negligence, even if they did not find that said negligence caused the decedent's death. There was no "inconsistent verdict" on this branch of the case.

In the end, what occurred worked no prejudice to the plaintiff. As we pointed out in *Footit* v. *Monsees*, 26 Mass. App. Ct. 173, 181 (1988) (Cutter, J.), "[w]here an answer to one special question is dispositive of the case and renders immaterial the answer to another special question, the dispositive answer is controlling." When the jury found that Parrish's conduct was not the cause of the decedent's death, that answer controlled the disposition of the punitive damages question and rendered the jury's answer to question 15 immaterial.

We turn, now, to the defendants' claims on appeal.

1. The defendants claim that the judge erred in allowing the plaintiff to amend his complaint to add c. 93A claims, there having been no demand letter prior to the commencement of the action in July, 1991. See G. L. c. 93A, § 9(3). Subsequently, the plaintiff did serve a demand letter dated September 14, 1992. The letter carefully described the events giving rise to the claim as well as the full reach of the claim under 93A. See *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975). The letter solicited a settlement offer within thirty days. On October 14, 1992, counsel for Crescent Ridge responded with a $250,000 offer to settle all claims against that defendant. The plaintiff's motion to file a second amended complaint (reciting the service of the 93A demand letter and the response thereto) was filed on November 13, 1992, and allowed on November 18, 1992.

There was no error. One purpose of the demand letter requirement is to encourage negotiation and settlement. See *ibid.* Crescent Ridge submitted a substantial offer in response to the demand. Contrary to the defendants' assertions, the fact that the demand letter did not specify the dollar amount demanded is not decisive since, as noted above, the letter was otherwise comprehensive and detailed. Compare *Fredericks* v. *Rosenblatt*, 40 Mass. App. Ct. 713, 716-718 (1996) (93A demand letter adequate even though damages claimed grossly exceeded amount justified by the evidence).

The thirty-day requirement is not necessarily jurisdictional. See *York* v. *Sullivan*, 369 Mass. 157, 163 (1975) ("[T]he thirty-day requirement . . . is not jurisdictional in the sense that a party cannot waive it . . . . Demand before suit is often a fruitless ceremony."). Further, in such cases, dismissal does not

"ordinarily bar a suit brought after the thirty days ha[ve] run." *Id.* at 164. See *Fredericks, supra* at 716-717 (rejecting "jurisdictional" argument for 93A demand letter and citing *York v. Sullivan, supra*).

On the facts of this case, we see no basis upon which the plaintiff's 93A claim may, or should be, nullified.

2. The defendants claim that the judge's award of damages was beyond his authority. This argument is based on the fact that the jury awarded the plaintiff $125,000 and the judge, on the plaintiff's 93A claim, awarded him $250,000. Since, the argument continues, the judge made no finding of wilfulness, doubling of the award was beyond the judge's authority.

This argument fails to take account of the judge's subsequent order in which he stated that the 93A damages assessed by him "were *not* multiple damages." There was no error. See *Chamberlayne Sch.* v. *Banker*, 30 Mass. App. Ct. 346, 353-355 (1991) (judge substituted his own 93A findings on damages for those of the jury; held, no error).

3. *The award of attorney's fees.* The amount of the award for attorney's fees is within the "broad discretion of the trial judge." *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 106 (1983). The judge, who was the trial judge, acting on the motion for fees, held an evidentiary hearing in which the entire matter of fees was reviewed. Following the hearing, the judge issued his memorandum of decision in which he carefully described his findings, which were consistent with *Linthicum* v. *Archambault*, 379 Mass. 381, 388-389 (1979), and he explained his rulings. We disagree in one respect only.

The plaintiff's 93A claim was not included in the complaint until November 18, 1992. While the 93A claim, and the evidence in support thereof, was entirely parallel with the negligence claim (breach of warranty), see *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 189 (1990), still, only a 93A claim in this case would permit the recovery of attorney's fees. However, we see no basis upon which the plaintiff may recover attorney's fees on his 93A claim for the period prior to November 18, 1992, when the 93A claim was added to the case. Since the judge properly limited the award of fees to the period ending with the date of the rejection of the defendants' reasonable offer of settlement, see c. 93A, § 9(4), namely, October 14, 1992, the plaintiff is not entitled to an award of attorney's fees. The same analysis applies to the award of costs.

4. *Defendants' rule 67 motion.* Finally, the defendants claim the judge erred in denying their rule 67 motion to deposit the sum of $200,000 into court to avoid the accrual of statutory interest. Mass.R.Civ.P. 67, 365 Mass. 835 (1974). The judge's denial of the motion was not an abuse of his discretion. See Smith & Zobel, Rules Practice § 67.2 (1981) (where would-be-depositor denies liability, the court will probably withhold leave to deposit). Contrast cases where the depositor is a mere stakeholder, or does not contest liability to at least someone among two or more claimants, or denies liability only in part. See *ibid.*

For the reasons stated above, the amended judgment is to be modified to strike the award of attorney's fees and costs. As so modified, the amended judgment is affirmed.

*So ordered.*